UNITED STATES of America,
Plaintiff-Appellee,

v.

James GLYNN, Defendant-Appellant.

No. 79–1763.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 23, 1980.

Decided July 28, 1980.

David P. Schippers, Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, U. S. Atty., James R. Ferguson, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, BAUER and CUDAHY, Circuit Judges.

BAUER, Circuit Judge.

Defendant-appellant James Glynn appeals from his conviction by a jury on twenty-five counts of extortion under color of official right in violation of the Hobbs Act, 18 U.S.C. § 1951. The government voluntarily dismissed six counts of the thirty-three count indictment and Glynn was acquitted of two other counts. Glynn asserts that there was an insufficient effect on interstate commerce to invoke federal jurisdiction under the Hobbs Act and asks that we depart from settled Circuit law in applying the standards for determining whether the extortion occurred "under color of official right." He also asserts several trial errors. We affirm.

I

Appellant Glynn was an electrical inspector for the City of Chicago. Under municipal law, an electrical inspector enforces the Chicago electrical code. He must approve all electrical work done in his district and may issue defect notices for violations of the code. If an electrical contractor fails to correct the violations, he may be placed on "F-5" status, which bars him from receiving any electrical permits. Contractors are also liable for fines up to $200 a day for violations. The electrical inspector may also inspect buildings in his district to test compliance with the code and he may order an owner to make repairs by writing a reinspection letter.

The evidence at trial showed that Glynn used his position as an electrical inspector to extort money from seven electrical contractors from 1974 to 1978. Willard Dunn of Supreme Electric Company testified that he paid Glynn because the inspector had told him that "I could very well be put out of business if I didn't cooperate and pay whatever amount, something on each job that I had done in the district." Tr. 126. Dunn paid Glynn $600 with a company check to approve work being done according to a permit (Count 3). In Counts 1 and 2, Dunn paid Glynn $125 for work already completed and $100 so that Glynn would not write a defect notice on work to be done on another site. The money for both payoffs was provided by the FBI; the indictment charged that Glynn "knowingly and wilfully did attempt to affect commerce . . . by extortion" in these counts.

Lee Roy Harper testified that he was sole owner of Harper's Electrical Company (Count 4). Harper was not licensed to do electrical work in Chicago, and he paid $250 so that Glynn would acquire permits for Harper to work on two jobs. Harper also paid Glynn with FBI funds; Glynn was charged with an attempt to affect commerce by extortion in Count 4.

Marvin Goldzweig testified that he was sole owner of Best Neon Company. He was erecting a sign without a permit, although an application was being processed. Glynn stopped the workers and told Goldzweig to take the sign down because he had already written up a violation. Tr. 259. Glynn offered to meet him at the job site the next day; Goldzweig paid Glynn $30 at that time and Glynn allowed the work to continue. Tr. 261–62.

Klaudijus Pumputis testified that he was a partner in M & P Electric Company and that he made fifteen to twenty payments to Glynn over the period covered by the indictment (Counts 6–10, 21–25, 27–32). Glynn had earlier warned Pumputis that he would put M & P Electric Company out of business with defect notices unless the contractor paid Glynn ten per cent of its fee on each of its jobs in the district. Tr. 290. Pumputis kept business records indicating the amount of payment on each job. While he did not have a specific recollection of the

circumstances surrounding each payment, he testified that the money for the payoffs came from the business. Tr. 313. He also stated that on most occasions the cost of the payment was added to the customer's cost for the job. Tr. 327, 331.

James W. Kelly testified that he was president of East Chesterfield Electric Company. He received a defect notice for work done and met with Glynn. The inspector told Kelly that he wanted $300 since the contractor's work would bring about $3,000. Glynn later accepted $300 for that and another job (Count 14). Kelly also paid Glynn $50 for work done at another site (Count 15). Kelly testified that he made the payments to avoid receiving defect notices. Tr. 346, 367–68. He also testified that had he done the work called for by Glynn at each site, it would have cost his customers an additional $500. Tr. 352, 355.

James Lee Hines testified that he was sole owner of OG & J Electric Company. He received defect notices for work already completed and contacted Glynn. Glynn met Hines at the job site and asked if Hines had anything for him. Hines testified that he paid Glynn $50 to get the work approved (Count 17). Tr. 381.

James C. Hargrett testified that he was sole owner of Hargrett Electric Company. He received a notice that his firm had been placed on F–5 status because of unsatisfactory work at a job site. He toured the building with Glynn, and although Glynn did not find any defects on the job, he stated "I have spent almost $200 [to repair an automobile], and you are on F–5, and you know what you have to do." Hargrett testified further that he then paid Glynn $50 to avoid being placed on F–5 status (Count 33). Tr. 447.

## II

■ The Hobbs Act punishes anyone who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, . . . [by] extortion . . . ." 18 U.S.C. § 1951. This language manifests a purpose "to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." *Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). The statute's purpose parallels that of the Commerce clause itself—to remove barriers from the free flow of commerce. *United States v. Staszcuk*, 517 F.2d 53, 58 (7th Cir.), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975). Thus, an effect on interstate commerce will be shown even if the actual impact on commerce is *de minimis*, or, in the absence of proof of an actual impact, if there is a realistic probability that the extortionate transaction will have some effect on interstate commerce. *United States v. Blakey and Berry*, 607 F.2d 779, 783 (7th Cir. 1979).

Glynn's main contention on appeal is that the evidence failed to demonstrate a sufficient effect on commerce to confer federal jurisdiction. We disagree. The jury was instructed on two bases on which it could find an effect on commerce. First, the jury was instructed on the depletion of assets theory, which, we recently noted, is well-established in the circuits. *United States v. Blakey and Berry*, 607 F.2d at 784 (citing cases). Under the depletion of assets theory,

> commerce is affected when an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing the victim's potential as a purchaser of such goods.

*United States v. Elders*, 569 F.2d 1020, 1025 (7th Cir. 1978); *United States v. DeMet*, 486 F.2d 816 (7th Cir. 1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974).

■ There was sufficient evidence to demonstrate that the assets of the contractors were depleted by the extortion. First, the parties stipulated that all the contractors purchased supplies from electrical supply houses whose goods originated from out of state. Tr. 497–99. Second, the contractors paid Glynn with funds that might otherwise have been used in their businesses.

The involved contractors were corporate entities[1] or sole proprietorships. While not all the contractors expressly testified that they paid Glynn with company funds, they all testified that they paid Glynn to remove legal obstacles to the operation of their businesses. The jury could have reasonably inferred that the funds were business funds used for a business purpose. *See, e. g., United States v. Irali*, 503 F.2d 1295 (7th Cir. 1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975) (owner paid off liquor license clerk so that tavern could open); *United States v. Harding*, 563 F.2d 299 (6th Cir. 1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978) (applicant paid for copy of real estate licensing exam). The combination of these two factors demonstrates that the payoffs to Glynn decreased the financial resources of the affected businesses and lessened the victims' ability to purchase goods in interstate commerce. Thus, there was sufficient evidence for the jury to conclude that there was at least a reasonable probability that commerce was affected under the depletion of assets instruction.

The jury was also instructed that commerce is affected when "as part of the alleged extortion money was obtained which had the effect of making it unnecessary for that company to purchase [interstate] good[s] for a particular job." Defendant did not object to this instruction, which is supported by precedent. *See Battaglia v. United States*, 383 F.2d 303, 305 (9th Cir. 1967), *cert. denied*, 390 U.S. 907, 88 S.Ct. 817, 19 L.Ed.2d 874 (1968) (extortion prevented the use of a pool table purchased from out of state). James W. Kelly of East Chesterfield Electric Company testified that he paid Glynn on two occasions so that he would not have to put in additional work claimed by Glynn to be necessary to cure violations of the electrical code. Kelly testified that it would have cost him up to $500 to put in the additional work. He instead paid Glynn $300 and "tagged the payoff to the customer's bill." Mr. Pumputis of M & P Electric also testified that the cost of the payoff was added into the bill as a cost of the job on most occasions. Tr. at 327, 331.

■ Glynn asserts that the passing through of the cost of the payoff to the customer negatived any effect on interstate commerce. True, the payments did not deplete the resources of East Chesterfield Electric. But the jury could have easily found that the payoff affected commerce because it stopped the purchase of goods that would have been required to correct the deficiencies found by Glynn. In the case of M & P Electric, Pumputis did not testify specifically on which occasions the cost of the payoff was passed on to his customers. He did, however, testify on redirect examination that the money used to pay Glynn "came from the business," thus supporting the jury's determination under the depletion of assets theory. Moreover, at the time of the offense, which is the point at which the criminality of Glynn's conduct must be judged, M & P Electric's assets were depleted. The company's subsequent conduct in attempting to recoup its losses does not affect Glynn's criminal liability.

■ The jury was properly instructed as to the grounds on which an effect on commerce could be found. In all, the evidence demonstrated a sufficient impact on commerce for every count on which Glynn was convicted.[2]

---

1. M & P Electric was a partnership that was later incorporated.

2. Judge Swygert's dissent on Counts I, II and IV is surprising, as the propriety of the attempt counts has never been raised as an issue. The trial judge instructed the jury, without objection, that the Government had "to prove in connection with the commerce requirement under Counts I, II and IV . . . (a) that the defendant knowingly and intentionally did the acts alleged in those counts; and (b) that those acts would have had the necessary effect upon commerce (as I have described that effect) had the money involved not been furnished by the Federal Bureau of Investigation." Glynn's trial counsel, an able and experienced practitioner, never objected to the instruction, or objected to the attempt counts in his pre-trial motions, at trial, post-trial motions, the briefs on appeal or at oral argument.

## III

■ Appellant's other arguments on appeal may be dealt with summarily. It is firmly established that extortion under color of official right embraces the conduct charged here. *United States v. Price*, 617 F.2d 455 (7th Cir. 1979); *United States v. Elders; United States v. Braasch*, 505 F.2d 139 (7th Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); *United States v. Crowley*, 504 F.2d 992 (7th Cir. 1974). Glynn threatened to put contractors out of business and demanded payoffs before he gave final approval for electrical work or removed defect notices. These are surely the acts of a "faithless public servant" whose conduct "is a species of the 'blackmail upon industry' which Congress mustered its full power to eradicate." *United States v. Staszcuk*, 517 F.2d at 59. Appellant has advanced no new reason why we should depart from this clearly charted course.

Appellant's assertions of trial error are also without merit. The jury instructions fairly, adequately and accurately stated the law on what constitutes extortion under color of official right. *See United States v. Braasch*, 505 F.2d at 150–51; *United States v. Crowley*, 504 F.2d at 995–97.

■ Glynn complains that his cross-examination of certain witnesses was improperly restricted. The court ruled that the defense could not ask a leading question of a government witness about a conversation with the defendant unless counsel was prepared to present evidence to contradict the witness's answer. We do not think Glynn was prejudiced by the court's admonition. Defense counsel did not ask what transpired during a particular conversation, but asked whether the witness made a particular statement, hoping to elicit a negative response for the purpose of impeachment.

Under the circumstances, it was no abuse of discretion to ask "whether and how counsel intend[ed] to follow up the question with impeaching proof." *United States v. Bohle*, 445 F.2d 54, 74 (7th Cir. 1971). The judge's statement did not amount to a comment on the failure of the defendant to testify, thus distinguishing the present case from the cases cited by appellant.

Appellant's conviction is

AFFIRMED.

SWYGERT, Circuit Judge, dissenting in part and concurring in part.

I dissent from the affirmance of the conviction with respect to several counts in the indictment.

## I

I am unable to comprehend how the assets of the Supreme Electric Company could have been depleted when the payoffs made in Count I, $100.00, and in Count II, $125.00, were furnished by the Federal Bureau of Investigation. Count IV presents the same situation: Lee Roy Harper, the owner of Harper's Electric Company, made a payoff of $250.00 to the defendant with FBI funds.

The argument is made that Hobbs Act jurisdiction exists as to these counts because they charge an *attempt* to affect commerce in contrast to actual impact; therefore, the source of the bribe money is irrelevant. The argument, although superficially plausible, is, in truth, both untenable and illusory.

First, the facts are that more than a mere attempt was made to extort money from the contractors named in Counts I, II, and IV. The bribery negotiations between the contractors and the defendant were not frustrated or aborted; they culminated in actual payments of bribes. Even if it could

Nor do we think, without delving too much into the merits, that there was any plain error. The statute punishes "whoever in any way . . affects commerce . . . [by] extortion or attempts . . . so to do . . . ." 18 U.S.C. § 1951. Every court which has considered the issue has held that an indictment charging an attempt to affect commerce by extortion is proper. See *United States v. Rosa*, 560 F.2d 149, 152–53 (3d Cir.) (en banc), *cert. denied sub nom. Sica v. United States*, 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 135 (1977) (listing cases); *United States v. Green*, 246 F.2d 155 (7th Cir.), *cert. denied*, 355 U.S. 871, 78 S.Ct. 122, 2 L.Ed.2d 76 (1957); *United States v. Brooklier*, 459 F.Supp. 476 (C.D.Calif.1978).

be said that the initial negotiations constituted an attempt, they eventually merged into a completed transaction, the transfer of money.

But even viewing the facts as portraying only an attempt to affect commerce, as the Government asks us to do, the argument still fails. This is because any attempt to affect commerce was an impossibility when the monies offered and delivered to the defendant were Government funds rather than assets of the contractors. Conceptually, the transactions were illusory insofar as their having any possibility, let alone probability, of an effect on commerce. There was no possible risk that the contractors' assets might be depleted.

The case here is different from one involving the attempted sale or actual sale of contraband, such as guns or drugs, when Government funds are used. There the contraband exists and constitutes an element *vel non* of the offense. Here an effect, actual or potential, on commerce (a necessary jurisdictional element of a Hobbs Act prosecution) did not exist nor could it have come into existence.

Finally, the statute reads in part: "Whoever in any way or degree obstructs, delays or affects commerce . . ., by robbery or extortion or attempts . . . so to do . . . shall be fined . . . ." 18 U.S.C. § 1951. The statute does not cover "attempts" to affect commerce; it speaks only of "attempts" to rob or extort. Counts I, II, and IV charge that the defendant "did attempt to affect commerce . . . by extortion . . . ." Thus these counts were fatally flawed to start with; they did not charge a crime under the statute.

## II

With respect to Count VI through Count X and Count XXI through Count XXXII, involving payments to the defendant by Klaudijus Pumputis, part-owner of the M & P Electric Company, there was no evidence of an effect on interstate commerce. Pumputis testified that when payments were made to the defendant, it was the customer's money that was being paid through M & P.

I cannot understand how this "passing on" of the bribe monies to the customers could possibly have depleted the contractor's assets. The contractor, not his customers, was engaging in commerce, and the passing on of the bribe monies prevented any depletion of the contractor's assets. Additionally, there was no direct testimony, unlike the case where James Kelly added the cost of the bribe to the customer's bill, that the payments were made to avoid receiving defect notices.*

This case illustrates the cavalier posture that Government attorneys take in prosecuting extortions under the Hobbs Act when the conduct is essentially local in character. There seems to be no attenuation imaginable that will bar jurisdiction in a Hobbs Act case if the one who is extorted is engaged in some commercial transaction, however chimerical the interstate commerce aspect of the transaction.

---

* I have grave doubts about the validity of the alternative ground advanced by the majority for affirmance, namely, the avoidance of additional work or repairs by payment of the bribe. However, I do not dissent on that point.