UNITED STATES of America,
Plaintiff–Appellee,

v.

James Oliver HOCKING,
Defendant–Appellant.

No. 88–1087.

United States Court of Appeals,
Seventh Circuit.

Argued June 7, 1988.

Decided Oct. 14, 1988.

Rehearing and Rehearing En Banc
Denied Dec. 6, 1988.

See, also, 7th Cir., 841 F.2d 735.

**770**

John Casey, Casey & Casey, P.C., Springfield, Ill, for plaintiff-appellee.

Patrick J. Chesley, Asst. U.S. Atty., J. William Roberts, U.S. Atty., Springfield, Ill., for defendant-appellant.

Before CUDAHY and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

James Hocking appeals from his convictions on one count of racketeering in violation of 18 U.S.C. § 1962(c) (the Racketeer Influenced and Corrupt Organizations statute, 18 U.S.C. §§ 1961–1968 (1978)) and one count of extortion in violation of 18 U.S.C. § 1951 (the Hobbs Act, 18 U.S.C. §§ 1951–1955 (1986)).

I

In April 1986, James Hocking was employed as a Pre-qualification Financial Analyst with the Illinois Department of Transportation ("IDOT") assigned to the task of "pre-qualifying" contractors who wished to bid on road construction contracts let by the IDOT. Hocking's job required him to assess the financial resources and work capabilities of applicant firms by examining their assets, liabilities, operating equipment inventories and work experience. Based on that evaluation, Hocking would assign each firm a financial rating and a work rating that determined the maximum size contracts the contractor could bid on and the maximum total dollar amount of contracts the firm could hold at any one time.

On April 8, 1986, two Federal Bureau of Investigation ("FBI") agents, Steven Nash and David Steele, arrived at the Hocking residence at 5:30 p.m. When Hocking answered their knock at the door of the house, the agents identified themselves and inquired if they could enter in order to ask some questions regarding an ongoing criminal investigation being conducted at the IDOT. Hocking allowed the agents to enter his home whereupon he, his wife and the two agents walked into the living room and sat down. Shortly thereafter, the FBI agents asked appellant's wife to leave the room. At that point the agents began to question Hocking. The agents did not advise appellant of his *Miranda* rights at the beginning of, nor at any point during, the conversation.

Hocking was first asked to explain his job and describe how the pre-qualification and bidding processes work. That portion of the conversation lasted for somewhere between one-half hour and one and one-quarter hours. At that point the agents informed Hocking that some persons in the IDOT were taking money and other gratuities from contractors in exchange for favorable treatment of those contractors in the pre-qualification and bidding processes. They then confronted him with allegations that on two or more occasions he had accepted money from contractors. Hocking denied having accepted any money from contractors.

The FBI agents next told Hocking that they had tape recordings of two conversations between Hocking and contractors concerning payoffs made by the contractors to him. Although there is some dispute as to precisely what the agents said, it is apparent that they also told Hocking that he faced criminal charges and could be imprisoned. They spoke further of the possibility of the government forcing him to forfeit any monies he had received illegally or any items purchased with those funds. The agents also encouraged Hocking to tell the truth.

After protesting his innocence for some time, Hocking eventually acknowledged that he had accepted $1,000 on one occasion. At some point near the end of the conversation, one of the FBI agents prepared a one-page handwritten statement and gave it to Hocking for his signature. The statement reads:

I, James Oliver Hocking, do provide the following statement to special Agents Steven G. Nash and David E. Steele of the Federal Bureau of Investigation without any threats or promises: [sic] In approximately 1984, while employed by the state of Illinois, Illinois Department of Transportation, as Pre–Qualification Anaylsis [sic], received $1,000 cash from, I believe the name to be, Lawrence LaGioia, in return for assistance in prequalifying LaGioia for state contracts. This money was not due me and I know it to be illegal for my acceptance of the money. LaGioia is the brother of Vito LaGioia who is a paying [sic] contractor located in the Chicago, Illinois area. The money was paid in cash at the Illinois Department of Transportation Building, 2300 South Dirksen, Springfield, Illinois. [sic]

Hocking initialed the statement at its beginning and end, and signed and dated it at the bottom. Shortly after Hocking initialed and signed the statement, agents Nash and Steele left the house.

In a three-count indictment handed down on July 30, 1987, Hocking was charged with racketeering under 18 U.S.C. § 1962(c), as evidenced by acts of extortion in violation of 18 U.S.C. § 1951 and bribery in violation of Ill.Rev.Stat., Ch. 38, ¶ 33–1(d) (Count 1), and two separate acts of extortion in violation of 18 U.S.C. § 1951 (Counts 2 and 3). Before trial, the government moved to dismiss Count 2 and those portions of Count 1 that cited federal extortion as racketeering activities. The government's motion was granted by the district court and the Count 3 § 1951 extortion charge (renumbered Count 2) and the Count 1 § 1962(c) racketeering charge, with an alleged act of state law bribery as its basis, proceeded to trial on October 21, 1987.

On August 31, 1987 appellant had moved to suppress the statement he gave to the two FBI agents on April 8, 1986. After a hearing on the matter on September 10, 1987, the district court denied appellant's motion to suppress. Following a jury trial, during which the district judge denied appellant's motion for a directed verdict of acquittal at the close of the government's case in chief, Hocking was found guilty on both counts. After denial of appellant's post-trial motions for a new trial and for judgment of acquittal, the district court sentenced him to eight years imprisonment and five years probation. This appeal followed.

## II

Hocking raises five claims on this appeal. First, he maintains that the statement he signed on April 8, 1986 in the presence of the two FBI agents should have been excluded from evidence because the agents failed to give him *Miranda* warnings at any time during their interview of him on that date. Hocking claims further that the April 8, 1986 statement was inadmissible because he was coerced into signing it by the two FBI agents. Appellant also asserts that the district court erred in not granting his motion for a directed verdict of acquittal. The basis for that motion was Hocking's claim that the court was without jurisdiction over the charged § 1951 offense because the government failed to prove the nexus between his actions and interstate commerce necessary to support a conviction under the Hobbs Act.

Hocking also asserts that the district court erred when, in instructing the jury on the 18 U.S.C. § 1962(c) racketeering charge, it defined the Illinois Department of Transportation as an "enterprise" falling within the reach of § 1962(c). Finally, appellant maintains that the district court erred when it denied his motion for a directed verdict of acquittal on the § 1962(c) racketeering charge because the government failed to prove that he committed any acts of bribery as proscribed by Ill.Rev. Stat., Ch. 38, ¶ 33–1(d).

## III

### A. The Failure of the FBI Agents to Give the *Miranda* Warnings

Hocking maintains that the failure of the two FBI agents who questioned him on April 8, 1986 to give him *Miranda* warnings renders the statement he signed on that date inadmissible. It is well established that "[t]he police are required to give [*Miranda*] warnings only 'where there has been such a restriction on a person's freedom as to render him in custody.'" *United States v. Bush*, 820 F.2d 858, 861 (7th Cir.1987) (quoting *California v. Beheler*, 463 U.S. 1121, 1124, 103 S.Ct. 3517, 3519, 77 L.Ed.2d 1275 (1983) (quoting in turn *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977))). "[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question." *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714. "*Miranda* deals only with 'the admissibility of statements obtained from an individual who is subjected to custodial police interrogation.'" *United States v. Lane*, 811 F.2d 1166, 1170 (7th Cir.1987) (quoting *Miranda v. Arizona*, 384 U.S. 436, 439, 86 S.Ct. 1602, 1609, 16 L.Ed.2d 694 (1966)). *See also United States v. Jackson*, 836 F.2d 324, 326 (7th Cir.1987); *United States v. Jones*, 630 F.2d 613, 615 (8th Cir.1980) ("The critical question [with regard to the necessity for the *Miranda* warnings] is whether the interrogation occurred in a custodial setting.").

Hocking asserts that he was in fact in custody at the time the two FBI agents interrogated him in his home. He argues that due to his age (62 years old), heart condition and inexperience with the law, the admonitions by the two agents that he faced indictment, imprisonment and forfeiture of his assets acted in concert to convince him that he was under restraint. Hocking believes that this perception of restraint on his part was sufficient to trigger the necessity for *Miranda* warnings. Appellant also points out that he was "beyond the suspect stage" and "definitely at the accusatory stage" in April 1986.

The district court determined that the April 8, 1986 interview of Hocking by the two FBI agents did not constitute a "custodial interrogation" as contemplated by *Miranda* and its progeny. Although this determination tends to follow from various factual findings, the ultimate issue of whether there was a custodial interrogation is a mixed question of law and fact. *United States v. Calisto*, 838 F.2d 711, 717–18 (3d Cir.1988). Therefore, this determination is independently reviewable by an appellate court. *See Schuneman v. United States*, 783 F.2d 694, 699 (7th Cir.1986); *United States ex rel. Tonaldi v. Elrod*, 716 F.2d 431, 437 (7th Cir.1983). *But see United States v. Poole*, 806 F.2d 853 (9th Cir. 1986) ("The determination whether a defendant was subjected to custodial interrogation is essentially factual, and is reviewable under the 'clearly erroneous' standard."), *amending, United States v. Poole*, 794 F.2d 462 (9th Cir.1986).

Appellant was not under arrest at the time of the April 8, 1986 interview. Therefore, our inquiry is limited to determining whether at the time of that interrogation Hocking was subjected to a "'restraint on [his] freedom of movement' of the degree associated with a formal arrest." *Beheler*, 463 U.S. at 1125, 103 S.Ct. at 3520 (quoting *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714) *quoted in Bush*, 820 F.2d at 861. *See also Lane*, 811 F.2d at 1170 ("Custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'") (quoting *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1609); *Berkemer*, 468 U.S. at 440, 104 S.Ct. at 3150. In making that determination we must remain cognizant of the fact that the *Miranda* warnings are not triggered merely because an individual who is being questioned by law enforcement officers is a suspect or is the focus of a criminal investigation. *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714. *See also Beckwith v. United States*, 425 U.S. 341, 345–46, 96 S.Ct. 1612, 1615–16, 48 L.Ed.2d 1 (1976). In addition, although it may be a significant factor in evaluating the voluntariness of a criminal defendant's confes-

sion or a statement, a finding by a reviewing court that the questioning of a suspect took place in a "coercive environment," in the absence of formal arrest or restraint on freedom, does not convert a noncustodial situation into a custodial interrogation. *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714.

"In determining whether the accused was subjected to custodial interrogation, a reviewing court should consider the totality of the circumstances. The accused's freedom to leave the scene and the purpose, place and length of interrogation are all relevant factors in making this determination." *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir.1985). *See also United States v. Rorex*, 737 F.2d 753, 755–56 (8th Cir.1984).

■ Careful examination of the record reveals the following circumstances attendant to the April 8, 1986 interview of appellant by FBI agents Nash and Steele. The interview was conducted in Hocking's home. FBI agents Nash and Steele entered the house only after Hocking granted them permission to do so. Hocking voluntarily agreed to submit to questioning. *See United States v. Schwartz*, 787 F.2d 257, 265 (7th Cir.1986). Nothing in the record indicates that any restraints were placed on Hocking's movement during the course of the questioning. *See Bush*, 820 F.2d at 862. Appellant was free to leave the house, or to ask the agents to leave. He did neither.

Although the agents did ask Mrs. Hocking to leave the living room where the interview was conducted, they did so politely and with good reason. At no time did the two agents display their weapons or make any threatening gestures or statements to Hocking or his wife. The interview lasted some three hours. The agents did inform Hocking of the possibility of his indictment, imprisonment and the prospect of forfeiture of some of his assets. However, there is no indication in the record that the questioning was anything other than routine. Hocking was not compelled to answer the questions nor was he compelled to remain in the presence of the questioning FBI agents. *See Jones*, 630

F.2d at 616. Finally, there is no indication whatsoever that the agents engaged in the type of "strong arm tactics," that would have justified a belief on appellant's part that he was in custody. *See id.* at 615.

Based on the foregoing analysis of the circumstances attendant to the events of the evening of April 8, 1986, we are convinced that the questioning of appellant by FBI agents Nash and Steele was not a custodial interrogation. The district court did not err in that regard.

B. The Voluntariness of the April 8, 1986 Statement

■ In his initial brief, within the context of his *Miranda* argument, Hocking alleged that the statement he signed on April 8, 1986 was inadmissible because his signature resulted from "mental coercion" by the two FBI agents, rendering (the signature and) the statement involuntary. The statement signed by Hocking on April 8, 1986 was the functional equivalent of a confession to one of the crimes with which he was originally charged (the original Count 2 § 1951 charge which was ultimately dismissed on the government's motion) and also constituted a harmful admission pertaining to the second predicate racketeering act alleged in the Count 1 § 1962(c) charge, of which he was convicted. Accordingly, the well-defined standards for evaluating the voluntary nature of confessions are applicable here.

"[T]he ultimate issue of the voluntariness of a confession is a legal question requiring *de novo* review." *United States v. Hawkins*, 823 F.2d 1020, 1023 (7th Cir. 1987). In making the "voluntariness" determination we must "examine the entire record and make an independent determination." *Davis v. North Carolina*, 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966), *quoted in Beckwith*, 425 U.S. at 348, 96 S.Ct. at 1617 and *United States v. Serlin*, 707 F.2d 953, 958 (7th Cir.1983). If we conclude that the preponderance of the evidence establishes that Hocking signed the April 8, 1986 statement voluntarily, his argument that it should have been excluded must be rejected. *See Lego v. Twomey,*

404 U.S. 477, 486, 92 S.Ct. 619, 625, 30 L.Ed.2d 618 (1972), *cited in Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986).

"In contrast to the presumption of coercion that attends statements given during custodial interrogation in the absence of *Miranda* warnings, statements made during a noncustodial interrogation are not viewed with suspicion." *Serlin,* 707 F.2d at 958. Nevertheless, the Supreme Court has recognized that "noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear [an interrogee's] will to resist and bring about confessions not freely self-determined.'" *Beckwith,* 425 U.S. at 347–48, 96 S.Ct. at 1617 (quoting *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961)).

Thus, it is clear that the test for a voluntary confession is "whether the defendant's will was overborne at the time he confessed." *Lynumn v. State of Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963). Our court has previously stated that "[c]oercive police activity is 'a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.'" *Lane,* 811 F.2d at 1171 (quoting *Connelly,* 479 U.S. at 167, 107 S.Ct. at 522). *See also Lego,* 404 U.S. at 485, 92 S.Ct. at 624 ("The use of coerced confessions, whether true or false, is forbidden because the method used to extract them offends constitutional principles.").

Hocking claims that the April 8, 1986 statement should have been excluded from evidence because he was coerced into signing it by threats of imprisonment and loss of property made by the two FBI agents. We have carefully reviewed the record with regard to both the manner in which FBI agents Nash and Steele questioned Hocking on April 8, 1986 and the totality of the circumstances surrounding that interrogation. We find nothing in the record that reasonably supports the inference that the agents' statements and actions were so coercive as to overcome appellant's free will.

In April 1986 Hocking was a mature adult, 62 years of age, with substantial work experience of a relatively sophisticated nature. He did have a heart condition and was not experienced in dealing with interrogation by law enforcement officers. At the suppression hearing before the district court, appellant claimed to have been experiencing chest pains during the interview of April 8, 1986 and asserted further that he signed the statement only to get the FBI agents out of the house so that he could obtain legal representation. However, the record reveals that Hocking never informed the FBI agents that he was in cardiac distress and never asked them to terminate or postpone the interview so that he could contact an attorney. Although both of these contentions by appellant must be weighed in determining whether his signature on the April 8, 1986 statement resulted from a voluntary act, his failure to inform the questioning agents of his alleged physical distress or to tell them of his wish that they leave and his desire for representation at the time of his interrogation substantially detracts from the strength of the claim that his signature was coerced by the FBI agents.

Hocking was interrogated in the living room of his own home. The two FBI agents who questioned him sat several feet away on a sofa facing the one where appellant sat. The questioning appears to have been polite. The agents did in fact tell Hocking that they did not believe his initial denials of wrongdoing and did encourage him to tell the truth. It also appears that agents Nash and Steele advised appellant that he faced prosecution and possible imprisonment and forfeiture of the proceeds of any illegal conduct he had engaged in.

The two FBI agents appear to have acted reasonably and fairly in conducting their interrogation of appellant. We are unconvinced that under the circumstances faced by Hocking during the April 8, 1986 interrogation, a person of his age, maturity, intelligence and physical condition could not have resisted the agents' attempt to obtain a signature on the statement. The

fact that the statement itself, which Hocking acknowledged he read, albeit he claimed not to have read it carefully, stipulates that the declaration it sets forth was made "without any threats or promises" provides further support for the inference that appellant was not subjected to the type of debilitating coercion that is necessary to render a confession or statement involuntary. We find no reason to characterize the manner in which the agents conducted the interrogation as anything more than vigorous, persistent questioning, conduct which our Court has previously held not to vitiate an otherwise valid confession. *See United States v. Lehman,* 468 F.2d 93, 100–01 (7th Cir.), *cert. denied,* 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232 (1972).

▮ In light of the foregoing findings we are compelled to conclude that the preponderance of the evidence establishes that Hocking's signature on the April 8, 1986 statement was not obtained by coercion. Rather, the evidence in the record demonstrates that appellant voluntarily signed the statement.[1] Accordingly, we hold that the district court did not err when it found that appellant "freely cooperated" with the two FBI agents and as a result held the statement he signed to be admissible.

## C. The Hobbs Act Conviction—Interstate Commerce Nexus

▮ Proof of a violation of 18 U.S.C. § 1951 requires evidence to establish that

---

1. Hocking cites *Lynumn v. Illinois* as standing for the proposition that the action by law enforcement officers in threatening prosecution and imprisonment, coupled with the threat of a forfeiture of property, constitutes coercion that makes a confession *per se* involuntary. In that case the Supreme court did find that a confession was rendered involuntary, and therefore inadmissible, by the actions of three police officers who made certain threats to a suspect whom they were interrogating in her home. However, close examination of the interrogation and the nature of the threats made by the police in *Lynumn,* shows that appellant dramatically overstates the holding of that case.

In *Lynumn,* three police officers used a person they had previously arrested on drug-related charges to set up the petitioner, Lynumn, by allowing him to arrange and complete a purported marijuana purchase transaction. After completing the purchase from Lynumn, that third person lured Lynumn into the hallway of her apartment building, whereupon one of the officers sprang from a vestibule, seized her by both hands and placed her under arrest. The officers then led Lynumn into her apartment and commenced questioning her.

The three police officers encircled Lynumn in her apartment, confronted her with the twice-convicted felon who had set her up, and threatened her with the prospect of losing state financial aid for her children and the removal of the children from her custody if she did not cooperate. Based on these circumstances, and the petitioner's professed belief that the recommendation of the arresting officers regarding the assumption by the state of custody over her children and the loss of state financial aid would be accepted by the authorities, the Supreme Court concluded that the petitioner's will was overborne at the time she confessed. *See Lynumn,* 372 U.S. at 534, 83 S.Ct. at 920.

*Lynumn* does not establish a bright-line rule that any confession that results from, or follows, threats or admonitions of impending prosecution, imprisonment or forfeiture of property by an interrogating police official is automatically rendered involuntary. Rather, in *Lynumn* the Supreme Court applied the test articulated above, *i.e.,* whether the defendant's free will was overcome at the time she confessed, and concluded that in light of the conduct of the police and the circumstances surrounding the confession, the petitioner's confession was not "the product of a rational intellect and a free will." 372 U.S. at 534, 83 S.Ct. at 920 (quoting *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960)).

It is not entirely clear from the record that the statements of the two FBI agents as to the prospects of prosecution, imprisonment and assets forfeiture Hocking faced rose to the level of a threat. Even if we were to agree, *arguendo,* that the predictions made by FBI agents Nash and Steele as to the likelihood that Hocking would be prosecuted and subsequently imprisoned and his property seized were threats, we do not find those statements to have constituted the type of highly coercive, debilitating threats that were made by the police officers in *Lynumn.* Hocking was not under arrest at the time of the interrogation. He had not been physically touched by either of the interrogating agents and the agents' posture toward appellant during the interview (seated on a sofa several feet away from him) was not an intimidating one. The threat of the loss of one's Jeep or television (the items owned by Hocking purportedly cited by the agents as being subject to possible forfeiture) cannot reasonably be said to have the same disabling effect on an interrogee as the combined threat of an immediate loss of the custody of one's children and the denial of state financial aid for those children. For all these reasons, we find *Lynumn* to be distinguishable on the facts from this case.

the defendant's actions had an effect on interstate commerce. 18 U.S.C. § 1951(a) states:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

Our precedent establishes that the effect on interstate commerce necessary to support a Hobbs Act conviction is "slight" and that a violation of the statute may be made out "where there is no actual effect proved but there is a realistic probability of an effect." *United States v. Anderson*, 809 F.2d 1281, 1286 (7th Cir.1987), *cited in United States v. Frasch*, 818 F.2d 631, 634 (7th Cir.1987). *See also United States v. Glynn*, 627 F.2d 39, 41 (7th Cir.1980) ("[A]n effect on interstate commerce will be shown even if the actual impact on commerce is *de minimis*."); *United States v. Boulahanis*, 677 F.2d 586, 589–90 (7th Cir.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982).

The government's case against Hocking on Count 2, the § 1951 (Hobbs Act) extortion charge, was based on the "depletion of assets" theory of an effect on interstate commerce. Our court has embraced the depletion of assets theory and has stated that "commerce 'is affected when an enterprise which ... customarily purchases items in interstate commerce, has its assets

depleted through extortion, thereby curtailing the victim's *potential* as a purchaser of such goods.'" *Boulahanis*, 677 F.2d at 590 (quoting *United States v. Elders*, 569 F.2d 1020, 1025 (7th Cir.1978)). *See also United States v. Blakey*, 607 F.2d 779, 783–84 (7th Cir.1979).

Both of Hocking's challenges to his § 1951 conviction center on the claim that because his alleged actions did not have a sufficient impact on interstate commerce to trigger the jurisdiction of the district court under § 1951, the district court should have granted his motion for a directed verdict of acquittal. His arguments to that effect are couched as challenges to the sufficiency and correctness of the Hobbs Act instruction given to the jury by the district court, identified in the record as Government Instruction 32A.[2] Our Circuit's test for evaluating the propriety of a challenged jury instruction is well-established. If the instruction treats the issue fairly and adequately, it is not to be disturbed on appeal. *United States v. Perlaza*, 818 F.2d 1354, 1358 (7th Cir.), *cert. denied*, — U.S. ——, 108 S.Ct. 176, 98 L.Ed.2d 130 (1987). *See also United States v. Patrick*, 542 F.2d 381, 389 (7th Cir.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977). Thus, our task here is to ascertain whether the two aspects of the jury instruction which Hocking finds objectionable accurately reflect the controlling law.

Appellant first contends that the instruction improperly informed the jury that the necessary nexus to interstate commerce could be made out in his case despite the fact that the $1,000 he received from the contractor was provided by the FBI.

---

**2.** Government Instruction 32A reads as below:

I instruct you for purposes of count two that a realistic probability that commerce could be affected exists if you find beyond a reasonable doubt that:

1. The defendant received money from Wayne McGill on March 29, 1984;
2. From the facts presented to the defendant it appeared Wayne McGill represented a business and that the money the defendant was given by Wayne McGill was given on behalf of such business;
3. The business which Wayne McGill represented was located in the state of Illinois and customarily during the year 1984 purchased

or obtained equipment materials or supplies a component of which had come originally from outside Illinois; and
4. If the money paid to the defendant had been from Wayne McGill's business it potentially would have reduced the amount of money his business could have used to purchase or obtain equipment, materials or supplies a component of which had come originally from outside Illinois.

It is no defense to the offense charged in count two (attempted extortion) that the money paid to the defendant was in fact supplied by the Federal Bureau of Investigation and not by Wayne McGill's business.

Hocking avers that because $1,000 he received came from the FBI, and not the contractor, the contractor's assets could not have been depleted and therefore no effect on interstate commerce could have occurred.

Appellant's argument ignores one critical point. "The Hobbs Act proscribes not only the acts of obstructing commerce through extortion but also proscribes 'attempts ... so to do.' In short, a section 1951 violation is complete when one attempts to induce a victim engaged in interstate commerce to part with property." *United States v. Rindone*, 631 F.2d 491, 493 (7th Cir.1980). *See also Glynn*, 627 F.2d at 42. Based on this rationale, our Court has expressly rejected the argument advanced by appellant, *i.e.*, that because the money used in the extortionate transaction was supplied by the FBI, no depletion of the payor firm's assets was possible and consequently, no nexus with interstate commerce is made out. *Rindone*, 631 F.2d at 492–93. *See also United States v. Brooklier*, 685 F.2d 1208, 1216–17 (9th Cir.1982), *cert. denied*, 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983). As noted above, in *Rindone* we held that the § 1951 (attempted extortion) offense is complete at the time the attempt to extract payment is made, even before any money changes hands. This broad interpretation of the § 1951 offense, and our express holding in *Rindone* that the use of FBI money in lieu of the money belonging to the firm subjected to an extortion attempt does not preclude a finding of a sufficient effect on interstate commerce, moots appellant's first interstate commerce nexus claim.

■ Hocking also asserts that the disputed Hobbs Act instruction improperly permitted the jury to find a nexus with interstate commerce when in fact neither the contractor from whom funds were extorted nor the firms from which it purchased supplies were involved in interstate commerce. Although appellant does not identify the objectionable portion of Government Instruction 32A as given by the district court, we can safely presume that it was numbered paragraph 4. That

paragraph informed the jury that it could find a Hobbs Act violation if it determined, *inter alia*, that the business from which Hocking extorted money "was located in the state of Illinois and customarily during the year 1984 purchased or obtained equipment materials or supplies a component of which had come originally from outside Illinois." [sic]

The Supreme Court has interpreted the Hobbs Act to reach the "limits of the Commerce Clause." *Anderson*, 809 F.2d at 1281 (citing *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960)). As noted above, the effect on interstate commerce necessary to establish a Hobbs Act violation has been variously described as "slight" or "*de minimis.*" *Anderson*, 809 F.2d at 1281; *Glynn*, 627 F.2d at 41. Further, under the depletion of assets theory, the government need prove only a realistic probability of an effect on interstate commerce. *Anderson*, 809 F.2d at 1286; *Glynn*, 627 F.2d at 41. The fact that a business-firm victim of extortion or attempted extortion purchases supplies that are manufactured or otherwise originate from out of state, even if purchased through a wholesaler or another intermediary, is sufficient proof of a nexus to interstate commerce to trigger a jury finding of a Hobbs Act violation under the depletion of assets theory. *See United States v. Hedman*, 630 F.2d 1184, 1193 (7th Cir. 1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981); *Boulahanis*, 677 F.2d at 589–90. In light of our precedent and the sweeping language of § 1951(a) alluded to earlier, we have no difficulty in concluding that paragraph 4 of the challenged instruction constitutes an adequate and fair statement of the law it addresses pertaining to the government's obligation to prove an interstate commerce nexus in a Hobbs Act prosecution.

The preceding analysis demonstrates that appellant has failed to establish that the district court erred in giving Government Instruction 32A to the jury. Therefore, we reject both that claim and appellant's related contention that the district court erred in denying his motion for a

directed verdict of acquittal on the Count 2 § 1951 (Hobbs Act) extortion charge.

### D. The Challenged § 1962(c) Jury Instruction

■ Hocking contends that the district court erred when it instructed the jury that the Illinois Department of Transportation is an "enterprise" under § 1962(c) of the RICO statute. Our Court has expressly held that "governmental or public entities fit within the definition of 'enterprise' for purposes of RICO." *United States v. Kovic*, 684 F.2d 512, 516 (7th Cir.), *cert. denied*, 459 U.S. 972, 103 S.Ct. 304, 74 L.Ed. 2d 284 (1982) (citing *United States v. Lee Stoller Enterprises, Inc.*, 652 F.2d 1313, 1318–19 (7th Cir.), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981)). In light of our clear precedent, appellant's claim that the district court erred in instructing the jury that the IDOT is an "enterprise" within the reach of § 1962(c) is rejected.

### E. The Claim of No State Act of Bribery

■ Hocking contends that the district court erred in not directing a verdict of acquittal on the § 1962(c) racketeering charge because the evidence failed to prove that he committed the alleged underlying act of bribery as proscribed by Ill.Rev. Stat., Ch. 38, ¶ 33–1(d). Appellant does not claim that the jury was improperly instructed as to the elements of the Illinois state law bribery offense. Rather, he avers that there was not sufficient evidence in the record to support a jury finding that he did anything more than accept gratuities from contractors for which those contractors received no benefit. By appellant's test, that conduct does not rise to the level of a ¶ 33–1(d) violation.

Paragraph 33–1(d) provides that a person commits bribery when:

He receives, retains or agrees to accept any property or personal advantage which he is not authorized by law to accept knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the peformance of any act related to the employment or function of any public officer, public employee, juror or witness.

Ill.Rev.Stat., Ch. 38, ¶ 33–1(d) (1986). Appellant misstates the proof necessary to establish a violation of ¶ 33–1(d). " 'Bribery' in Illinois, is the tendering of money to a public employee to influence the performance of an act related to the public employee's official function." *People v. Powell*, 48 Ill.App.3d 723, 727, 6 Ill.Dec. 409, 412, 362 N.E.2d 1329, 1332 (1977), *rev'd on other grounds*, 72 Ill.2d 50, 18 Ill.Dec. 318, 377 N.E.2d 803 (1978), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1214, 59 L.Ed.2d 455 (1979). "In order to commit the offense of bribery, the statute does not require that the act to be influenced ever be performed." *People v. Dougherty*, 160 Ill.App.3d 870, 874, 112 Ill.Dec. 337, 340, 513 N.E.2d 946, 949 (1987).

Thus it is clear that in order to find appellant guilty of the underlying state bribery charge, it was not necessary that the jury determine that the contractors who paid money to him actually received benefit. Rather, all that was necessary for a ¶ 33–1(d) violation to be made out was proof that Hocking was a public employee, that the contractors paid money to Hocking with the intent of influencing an act related to his public employment, and finally that Hocking accepted the money knowing that the contractors paid it to him in order to influence the performance by him of any act relating to his public employment. Government Instruction 23C, given to the jury by the district court, accurately reflects the elements of the state bribery offense. Examination of the record discloses substantial evidence to support the inference that Hocking, a public employee, accepted monies from one or more contractors paid to him for the purpose of influencing him in the performance of his job, with knowledge that the money was paid to him for that reason.

When reviewing a sufficiency of the evidence claim it is not our role "to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be

sustained if there is substantial evidence, taking the view that is most favorable to the government, to support it." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), *quoted in United States v. Kord,* 836 F.2d 368, 371 (7th Cir.1988). "Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *Brandom v. United States,* 431 F.2d 1391, 1400 (7th Cir.1970), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 634 (1971) *quoted in United States v. Whaley,* 830 F.2d 1469, 1473 (7th Cir.1987), and *United States v. Moore,* 764 F.2d 476, 478 (7th Cir.1985). Applying these standards to appellant's sufficiency of the evidence claim with regard to the state bribery allegation underlying his conviction on Count 1, we find that claim to be without merit. The district court did not err when it denied appellant's motion for a directed verdict of acquittal on Count 1.

### IV

Based on the foregoing analysis, we find no reason to conclude that the district court erred in entering judgment of conviction against James Oliver Hocking for violations of 18 U.S.C. § 1951 and 18 U.S.C. § 1962(c). Accordingly, the judgment of the district court is AFFIRMED.