USCA1 Opinion

 

 ____________________
No. 91-1391 UNITED STATES, Appellee, v. HEATHER L. LANNI, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Francis J. Boyle, U.S. District Judge] ____________________ Before Selya, Circuit Judge, Coffin, Senior Circuit Judge, and Cyr, Circuit Judge. ____________________ Ralph J. Perrotta, by appointment of the Court, for appellant. Edwin J. Gale, Assistant United States Attorney, with whom Lincoln
C. Almond, United States Attorney, was on brief for appellee. ____________________ ____________________ COFFIN, Senior Circuit Judge. This appeal followed a
conditional plea of guilty to a charge of embezzlement from a
federally insured credit union in violation of 18 U.S.C. 657. In
entering the plea, under Fed. R. Crim. P. 11(a)(2), defendant-
appellant reserved the right to appeal the denial of her motion to
suppress statements made to FBI agents during an interview at her
home. The sole issue is whether the district court erred in
ruling, after a suppression hearing, that no Miranda warnings were
necessary, because defendant was not "in custody." Although
viewing this as a close case, we affirm. A district court's findings in a suppression hearing are
binding on appeal unless clearly erroneous, and we will uphold the
district court's denial of a motion to suppress if any reasonable
view of the evidence supports it. United States v. Stanley, 915
F.2d 54, 57 (1st Cir. 1990); United States v. Masse, 816 F.2d 805,
809 n.4 (1st Cir. 1987). In sketching the underlying events of
this case, we therefore select, where different versions of what
happened were given, those facts favorable to the government. Suspecting defendant of having participated in the
embezzlement of $7,000 from the Equitable Credit Union through
processing a check at her credit union teller window, two F.B.I.
agents went to her home between 8:00 and 8:30 a.m. on Monday,
August 6, 1990. Defendant, just awakened, after viewing the agents
through a window, hastily put on sweat pants and allowed the agents
to enter. Special Agent O'Connor, who did all of the questioning,
sat some ten feet away from defendant in the living room on an
adjoining sofa, Special Agent Eaton sitting near O'Connor. Apart from showing their credentials, identifying themselves,
and indicating that they wished to discuss a matter with defendant,
there was no other statement suggesting either that defendant was
free to terminate the conversation at any time or that she was not
free. No Miranda warnings were given. The interview lasted for
approximately four hours. When defendant's husband entered the
living room shortly after the agents' arrival, O'Connor asked him
if he would allow them to interview his wife alone. He acquiesced,
went to the kitchen, and made breakfast for the couple's two-year-
old son. He then sat with his son in the adjacent dining room,
which opened onto the living room. Defendant did not request and
did not have breakfast. The next hour began with O'Connor's requesting biographical
data and names of friends and acquaintances. He then asked
defendant to describe in detail the procedures she would follow in
cashing checks at the credit union. Finally, he asked defendant
whether she had cashed the $7,000 check in question. Defendant
denied having any recollection concerning it. During the morning,
the two-year-old boy, a dog, and a kitten played in the living room
area. At some point, defendant's father arrived, but was asked by
defendant to come back later. Then began another hour in which O'Connor asked defendant and
her husband to provide handwriting exemplars. Each wrote ten
checks with each hand, replicating the writing on the forged check, pursuant to step-by-step instructions from O'Connor. The date, the
amount of money in words, the amount of money in numerals, and the
signature were thus written out twenty times by each of the couple. The elapsed time was approximately one hour. Then followed renewed questioning about the cashing of the
check which became, to use the word of O'Connor, "intense." O'Connor indicated that defendant's explanation as to her lack of
knowledge of the check did not make any sense. Defendant finally
began to cry, said that she had been afraid of retaliation by
others, then gave O'Connor an oral statement of her involvement,
followed by a written statement, which took about 45 minutes to
execute. Defendant's husband also gave a written statement. After
breaking down, defendant asked to go to the bathroom, because she
had not gone all morning. O'Connor allowed her to do so. The district court, in a brief oral opinion, recognized that
to be interviewed by police officers is not a pleasant experience,
but that subjective apprehension was not the test. It noted that
the interview was conducted by only two officers and took place in
defendant's home. It added, "The only aspect of this matter that
might suggest some kind of coercion is the duration and the
character of the interrogation." But it concluded that defendant
was not in custody at the time of the interrogation and Miranda
warnings were not required. In evaluating whether a suspect was in custody and thus
entitled to Miranda warnings, we look to see, using objective
standards, whether there was a manifestation of a significant
deprivation of or restraint on the suspect's freedom of movement,
taking into account such factors as "'whether the suspect was
questioned in familiar or at least neutral surroundings, the number
of law enforcement officers present at the scene, the degree of
physical restraint placed upon the suspect, and the duration and
character of the interrogation.'" Masse, 816 F.2d at 809 (quoting
United States v. Streifel, 781 F.2d 953, 961 n.13 (1st Cir. 1986)). Our assessment is not accomplished by a color-matching
process, or by giving weights to various factors pro-and con-
custody, and totting up the columns. Nevertheless it helps us view
a case as either clear or close to isolate those factors that
suggest restraint and those that suggest freedom of movement. The
latter are these: there was no statement suggesting that defendant
was not free to leave or terminate the questioning; the hour of
8:00 or 8:30 a.m. is not an outlandish one; the interview was in
defendant's home, with her husband, child, and pets nearby; only
two agents were present and only one did the questioning; there
were no "tricks" such as a "good guy - bad guy" routine or the use
of false information; defendant was freely allowed to go to the
bathroom. The factors suggesting restraint are these: there was no
statement that defendant was free to leave or terminate
questioning, or that she could refuse to execute handwriting
samples; the appearance of the officers at 8:00 or 8:30 a.m. on a
Monday morning obviously caught defendant before she had dressed,
eaten, or prepared for the day; while in familiar surroundings,
defendant did not eat or go to the bathroom during the entire
morning; an agent requested defendant's husband to leave the
living room; the overall lapse of some four hours was not only
long in duration but of increasing intensity as defendant and her
husband executed the handwriting samples, following some 160
separate instructions from Agent O'Connor (four written sections of
ten sample checks for each hand of each person); an admittedly
tense atmosphere existed near the end as the agent expressed his
disbelief of defendant's profession of no recollection. This ranging of factors highlights for us the fact that the
case was not an easy one, as the district court realized with its
singling out the duration and character of the interrogation as
possibly suggestive of coercion. Defendant-appellant has cited her
strongest precedent, United States v. Griffin, 922 F.2d 1343 (8th
Cir. 1990). In that case, two F.B.I. agents, suspecting defendant
of involvement in a robbery, visited defendant's home at 7 p.m. When defendant arrived, the agents asked his parents to leave them
in private, and, without informing him of any rights, including
Miranda warnings, talked with him for two hours, obtaining
incriminating statements. But, in addition to these factors, which
are similar to those found in the case before us, and significant
in the Griffin court's conclusion that there was "restrain[t] to a
degree commonly associated with formal arrest," were the facts that
on two occasions when defendant went out of the room to obtain
cigarettes, he was accompanied by an agent, and that he was told to
remain in view of the agents at all times. Id. at 1354. In other
words, Griffin does not compel suppression in this case. There
were no restraint-indicative orders with the directness of those in
Griffin. On the other hand, the government has cited United States v.
Hocking, 860 F.2d 769 (7th Cir. 1988). In that case two agents
quizzed a suspect for three hours, asked his wife to leave,
revealed that they possessed two tape recordings of conversations
in which the suspect discussed payoffs, told him that he faced
criminal charges, could be imprisoned, and that monies he received
illegally could be forfeited. The court noted the politeness of
the agents, the absence of threatening gestures, the "routine"
nature of the questioning, and concluded that there had not been a
custodial interrogation. Id. at 773. As we concluded concerning
Griffin, so do we view Hocking; it does not compel a denial of the
motion to suppress. In the instant case, the time span was longer,
the handwriting exemplar exercise arguably more stressful, the lack
of food an added factor. What this comparison suggests to us is that the facts of this
case place it in the gray area where a court, having the benefit of
testimony and the "feel" of the situation, could decide that the
interrogation was or was not custodial. We therefore hold that the
district court did not commit clear error in drawing the inference
that defendant was not in custody. See Stanley, 915 F.2d at 57. We add one final note of caution. In argument before us,
counsel for the government took the position that this was a
clearcut case for denial of suppression. A decision to suppress on
the ground that the interrogation had reached the custodial status
would have been, he argued, clearly erroneous. Moreover, he argued
that defendant "clearly controlled" the playing field and that the
surroundings were "more relaxing for the suspect than the
officers." Such hyperbole not only falls well short of helpful
advocacy; it threatens one's hard-earned credibility. Affirmed.