UNITED STATES of America, Plaintiff,

v.

**Robert H. BAILIN, et al., Defendants.**

**No. 89 CR 668–1, 2, 4.**

United States District Court,
N.D. Illinois, E.D.

April 19, 1990.

See also 731 F.Supp. 865.

---

1480

Jeffrey B. Steinback, Genson, Steinback & Gillespie, Chicago, Ill., for defendant Robert H. Bailin.

Jerry D. Sparks and Noel Dennis, Chicago, Ill., for defendant Tom Crouch.

Robert M. Stephenson, Cotsirilos, Crowley, Stephenson, Tighe & Streicker, Chicago, Ill., for defendant James Marren.

David J. Stetler, McDermott, Will & Emery, Chicago, Ill., for defendant Joseph O'Malley.

Eugene J. Kelley, Jr., Arnstein & Lehr, Chicago, Ill., for defendant Mike Greenfield.

Steven J. Rosenberg, Rosenberg, Opdycke, Gildea, Hellner & Kelly, Chicago, Ill., for defendant Ray Pace.

William P. Murphy, Murphy, Peters, Davis & O'Brien, Chicago, Ill., for defendant Martin Riley, Jr.

James Meltreger, Onesto, Giglio, Meltreger & Associates, Chicago, Ill., for defendant Michael Sidel.

James Streicker, Cotsirilos, Crowley, Stephenson, Tighe & Streicker, Chicago, Ill., for defendant Mike Smith.

Patrick A. Tuite, Tuite, Mejia & Giachetti, Chicago, Ill., for defendant Gary Wright.

Michael Lorge, Laser, Kolman & Frank, Chicago, Ill., for defendant Aric March.

Nicholas J. Etten, Foran, Wiss & Schultz, Chicago, Ill., for defendant Daniel Parz.

Charles D. Sklarsky and Robert J. Byman, Jenner & Block, Chicago, Ill., for defendant Matt Newberger.

Michael Goggin, Oak Park, Ill., for defendant Thomas M. Braniff.

Thomas P. Sullivan and Jeffrey Colman, Jenner & Block, Chicago, Ill., for defendant John Baker.

Thomas A. Durkin, Arnstein & Lehr, Chicago, Ill., for defendant Sam Cali.

Richard Manning, Chicago, Ill., for defendant Michael Christ.

Thomas Shanahan, Mansker & Shanahan, Chicago, Ill., for defendant Ken Maslak.

Frank Stachyra, Riverside, Ill., for defendant Donald Callahan.

Michael D. Monico and Barry A. Spevack, Monico, Pavich & Spevack, Chicago, Ill., for defendants Brian Sledz and James Sledz.

Daniel Gillogly, Mark Pollack and Lisa Huestis, Asst. U.S. Attys., for the Government.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

This case is the product of an undercover investigation into the trading practices in the Japanese Yen Pit of the Chicago Mercantile Exchange. Defendants Bailin, Baker and Cali each seek to suppress statements made to agents of the Federal Bureau of Investigation ("FBI") and Assistant United States Attorneys ("AUSA") during interviews.

A question frequently asked by defense lawyers is—why do suspects make admissions? It might seem that it never would be in the interest of any person being investigated to respond to questions. The answer from psychologists and students of this subject is that suspects make admissions because they are in a state of mind which leads them to believe that cooperation is the best course of action to follow. The fact that statements do not appear to be in the subject's self-interest does not contradict the fact that they were motivated. R. Royal, *The Gentle Art of Interviewing and Interrogation*, 115 (1981). Interrogation for the purpose of motivating admissions becomes constitutionally objectionable only when the circumstances prevent the person being questioned from making a rational choice between answering or remaining silent. *Weidner v. Thieret*, 866 F.2d 958, 963 (7th Cir.1989).

Defendant Bailin asserts that his statements should be suppressed because they were prompted by the deceitful conduct of the Government agents. Defendant Baker alleges that his statements should be suppressed because they were prompted by "refined coercion." Baker also urges the court to exercise its supervisory powers to suppress his statements because an AUSA allegedly violated DR 7–104(a)(2) of the Illinois Code of Professional Responsibility by giving legal advice to him during their interview. Defendant Cali contends that his statements were given involuntarily. He also urges the court to suppress his statements because of an alleged violation of DR 7–104(a)(2).

The motions were the subject of a three-day evidentiary hearing. Defendants were granted leave to develop and fully brief all of the issues raised in their motions.

## I. BAILIN'S MOTION TO SUPPRESS

■ Bailin has moved to suppress statements he made to Government agents over the course of two interviews. The first was conducted by two FBI agents at Bailin's home. The second took place two days later when Bailin visited the offices of the FBI to discuss his case with an AUSA. At the hearing on the motion, the Government presented four witnesses. Bailin testified in support of his motion.

1482

A. Findings of Fact for Bailin's Motion

1. At approximately 7:00 a.m. on Saturday, January 21, 1989, FBI Agents Maura Kelly and Kevin Rust sought to serve Bailin with a grand jury subpoena at his apartment in the Presidential Towers complex in Chicago.

2. Bailin was not at home when the agents arrived. They left a copy of the subpoena with his wife. Agent Kelly told Mrs. Bailin that they would like to talk to her husband. Kelly also gave Mrs. Bailin one of her business cards.

3. Between 5:00 and 6:00 p.m. that evening, Bailin called the number on Agent Kelly's business card and reached Agent Ernest Locker. Bailin told Locker that he wanted to get "to the bottom of the situation," and that he was "anxious to talk to the agents" about the subpoena. Bailin agreed to meet with two agents that evening after Locker told him that it might be possible for the agents to return to discuss the matter.

4. At approximately 7:00 p.m. that evening, Agents Kelly and Rust returned to Bailin's apartment. Bailin's wife and child were present in the apartment. Bailin invited the agents into his study to talk privately.

5. At the time of these interviews, Bailin was 36 years old. He was employed as an independent trader in the Yen pit and had traded in the futures markets for approximately thirteen years. Bailin has an undergraduate degree in mathematics and economics from New York University and a Master's degree in finance and accounting from the University of Chicago.

6. Agent Kelly began the interview by telling Bailin about the nature of the investigation and that undercover Agent Dietrich Volk, who had posed as a Yen pit trader, had tape recorded his conversations and transactions with other traders. Bailin admitted to having occasionally traded with Volk because he was under the impression that Volk was a small, struggling trader like himself who needed help. Bailin then speculated that his trades with Volk were likely to have been captured on tape.

7. At that point, Bailin stated, "Perhaps I should have an attorney." Agent Kelly told Bailin that the agents could not advise him on the matter and that he would have to make that decision himself.

8. Bailin continued the interview, explaining to the agents that smaller traders like him had to agree to take losses from a broker if they wanted to keep receiving business. On more than one occasion, Bailin asked the agents why they were picking on him since he was such a "little fish" compared to the other traders in the pit.

9. Near the end of the interview, Bailin asked the agents about the specific charges that might be brought against him. Agent Kelly informed Bailin he would have to talk to someone from the United States Attorney's Office.

10. The January 21st interview lasted approximately one and one half hours. The agents conducted the interview in a polite manner. Although Bailin's demeanor was somewhat "excited," he readily answered all of their questions and repeatedly expressed his desire to continue cooperating with the Government.

11. On the following Monday, January 23, 1989, at approximately 3:00 p.m., Bailin went to the office of the FBI for the purpose of learning from an AUSA the specific charges that might be brought against him. Agents Kelly and Volk met with Bailin and directed him into an empty office.

12. During the interview, Bailin reaffirmed his desire to cooperate with the Government. He answered more of the agents' questions until a certain point when he asked whether he was doing the right thing by cooperating. Agent Volk told Bailin that he did not have to talk to the agents if he did not want to, but that he could be brought before a grand jury with a grant of immunity.

13. AUSA Gillogly joined the January 23rd interview after approximately an hour. Gillogly explained to Bailin that his trading activities could result in possible RICO charges and that under RICO, he could be subject to a twenty-year sentence and forfeiture of his ill-gotten assets. This

information was conveyed to Bailin in a polite, business-like fashion.

14. At that point, Bailin informed Gillogly that he would need to talk to an attorney before deciding whether to cooperate further. Gillogly responded by telling Bailin that he could not give him any advice on that decision.

### B. Conclusions of Law on Bailin's Motion

Bailin argues that the statements he made during both of these interviews were not given voluntarily. There is no dispute between the parties over the characterization of the statements as those made during the course of two noncustodial interviews and without the benefit of *Miranda* warnings.

A noncustodial interrogation conducted without the benefit of such warnings does not give rise to a presumption of coercion. *United States v. Hocking*, 860 F.2d 769, 774 (7th Cir.1988). Nonetheless, the Supreme Court has recognized that the conduct of Government agents in a noncustodial setting may prompt a suspect to make statements involuntarily. *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). In *Beckwith*, the Court stated that a "noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of ... law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined....'" *Id.* (quoting *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961)). Thus the question before the court is whether the defendant made the statements because his free will was overborne by virtue of the interrogative conduct of the agents. *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961) (statements may be admitted if they are "the product of an essentially free will and unconstrained choice of [their] maker"). In addressing this question, the court must

review the totality of the circumstances, including the nature of the interrogation as well as the characteristics of the accused. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). As a necessary predicate to a determination that the statements were made involuntarily, the court must find that "coercive police activity" during the interrogation caused the defendant to make his or her statements. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 527, 93 L.Ed.2d 473 (1986). The Government bears the overall burden of proving by a preponderance of the evidence that the statements were made voluntarily. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972).

Bailin's primary contention is that the agents prompted him to make his statements by means of "deceit, trickery, and false promises of leniency."[1] In *United States v. Serlin*, the Seventh Circuit held that in order to suppress on the basis of such a claim, the evidence must reveal that the Government agents (1) affirmatively mislead the defendant as to the true nature of their investigation, and (2) the misinformation was material to the defendant's decision to speak with the agents. *United States v. Serlin*, 707 F.2d 953, 956 (7th Cir.1983). The court went on to clarify that the "[s]imple failure to inform defendant that he was the subject of an investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead." *Id.* The testimony at the hearing on Bailin's motion does not support his motion to suppress on any of the foregoing grounds.

In support of his contention, Bailin first argues that the agents' initial attempt to serve him at 7:00 a.m. on a Saturday morning was intended to catch him off guard and leave him with insufficient time to assess whether to talk to them. Even if

---

1. Bailin contends that his arguments in support of suppression are applicable to the entirety of the January 21st and January 23rd interviews.

However, Bailin's own testimony regarding his conduct and the statements made during the interviews belies such a claim.

this assertion regarding the intent of the agents is correct, Bailin was not at home when the agents arrived. Bailin learned of the visit and subpoena later that day when he returned home. He initiated the subsequent interview with the agents by calling the offices of the FBI early that evening. On the basis of Bailin's own testimony, it is clear that he had sufficient time to decide whether to respond to the subpoena, whether to call and talk to the agents, or whether to contact an attorney. Bailin also had sufficient time to reassess whether he was going to talk to the agents since it took them approximately an hour to arrive at his apartment.

In support of his claim of deceit, Bailin argues that he made his statements during the January 21st interview only because he was mislead by Agent Kelly. Bailin testified that Kelly told him over the phone that the use of a subpoena did not necessarily mean he was in trouble because it was a standard investigative technique. Bailin also testified that during the interview, Agent Kelly told him he was not a "target" of the investigation.

The testimony at the hearing does not support an inference in favor of Bailin's claim that he was deceived by the agents. To begin with, Bailin could not recall that he talked to Agent Locker rather than Agent Kelly when he called the FBI offices. Moreover, Agent Kelly denied telling Bailin that he was not a target of the investigation. In fact, both Agent Kelly and Agent Rust testified that they began the January 21st interview with Bailin by informing him about the nature of the investigation and Agent Volk's use of a tape recorder in the Yen pit. At that point, Bailin fully understood that if he had made any illegal trades with Volk, it was likely that those trades were captured on tape. Agent Rust further testified that when Bailin was told about the recordings, he speculated that his trades with Agent Volk were captured on tape and that that was good evidence. The testimony does not show that Bailin was mislead as to the nature of the investigation, or that such alleged misinformation was material to his decision to speak with the agents. *Serlin,*

707 F.2d at 956. Bailin's claim of deceit is unavailing.

Bailin also claims that he was threatened during both the January 21st and January 23rd interviews and that these threats were patently coercive. Defendant's Brief In Support Of His Motion To Suppress at 11 (citing *United States v. Tingle,* 658 F.2d 1332, 1336 (9th Cir.1981)). Bailin testified that when he expressed his reluctance to talk to the agents about his own trading activities without first obtaining legal advice, Agent Kelly threatened to convict him under RICO. He also testified that Agent Kelly threatened him with RICO and forfeiture charges during the January 23rd interview.

The evidence does not support a finding that Bailin was threatened during either of the interviews. Bailin's allegation that he was threatened by Agent Kelly during the January 21st interview is not credible, especially when measured against defendant's entire testimony. Bailin specifically testified that Agent Kelly told him that if he did not cooperate, the Government would convict him under RICO, take his house, and make him "talk and say anything they wanted." At the same time, Bailin testified that he repeatedly asked the agents whether he was in trouble and needed to hire an attorney. It is inconceivable that Bailin would repeatedly ask whether he was in trouble and whether he needed an attorney in the face of such a threat. Both of these claims are further undermined by Bailin's testimony on cross examination that he did not attempt to contact an attorney before going to the offices of the FBI two days later.

With reference to the January 23rd interview, Bailin claims that both Agent Volk and AUSA Gillogly threatened him with charges under RICO and with possible forfeiture. The testimony shows, however, that Bailin was informed about the charges and penalties he faced. The agents testified that this information was conveyed to Bailin in a professional and business-like manner. *See United States v. Hocking,* 860 F.2d at 775 (agents' act of informing defendant of prosecution, possible impris-

onment and forfeiture was not coercive under the circumstances). According to Bailin's own testimony, he went to the FBI offices for this very purpose. The agents' act of informing Bailin of the potential charges were made in response to his inquiry rather than as a threat.[2]

Finally, Bailin argues that his statements were prompted by the agents' false promises of leniency in exchange for his cooperation. In support of this argument, Bailin relies upon the oft-quoted passage in *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), in which the court held that a confession is not voluntary if it is "obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Id.* at 542–43, 18 S.Ct. at 187. In this Circuit, *Bram* has been substantially limited in its application. In *United States v. Long*, 852 F.2d 975 (7th Cir.1988), the Seventh Circuit emphasized that a *per se* finding of involuntariness based on a liberal reading of *Bram* would undermine the "totality of circumstances" test, which has been reaffirmed by the Supreme Court as the appropriate test for measuring the voluntariness of a confession. *See Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985). Accordingly, the Seventh Circuit held that a promise of leniency is but one factor to consider under the totality of circumstances test. *Long*, 852 F.2d at 977.

The testimony in the present case does not support an inference that Bailin was promised lenient treatment in exchange for his cooperation. Nor does the testimony reveal that Bailin was prompted to cooperate against his will only after being offered an alleged promise.

Because the preponderance of credible testimony reveals that Bailin made his statements to the agents free of any coercive or deceitful conduct, his motion to dismiss is denied.

## II. BAKER'S MOTION TO SUPPRESS

█ Baker seeks to suppress the statements he made to two FBI agents and two AUSAs during an interview with them at his home on the evening of January 18, 1989. At the hearing on Baker's motion, Agents Volk and Bargmann testified on behalf of the Government. The defendant's wife, Sally Baker, testified on defendant's behalf.

### A. Findings of Fact on Baker's Motion

1. At approximately 7:30 p.m. on January 18, 1989, Agent Volk, Agent Mark Bargmann, AUSA Gillogly, and AUSA Mark Pollack (collectively referred to as "the agents") appeared at Baker's home in LaGrange, Illinois.

2. When John and Sally Baker answered the door, the agents showed the Bakers their badges and Agent Volk addressed the defendant by saying, "John, you know who I am, you know you are on tape, I think it would be a good idea if you listened to what we have to say." Baker then invited the callers into his house and directed them into the kitchen. The agents and John Baker took seats. Sally Baker sat on the floor. The two FBI agents were armed, however, their guns were covered by their overcoats and were not visible to the Bakers at any point during the evening.

3. Baker is a successful commodities trader and has been employed as such for approximately fourteen years.

4. Before the interview began, Mrs. Baker heard an agent—she is unsure which one—tell her that she had a nice house, and that it would be too bad if she were to lose it. There is no evidence that John Baker heard this comment.

5. Agent Volk began the interview by explaining to Baker that the Government had conducted an undercover investigation of the Yen pit; that he had tape recorded numerous conversations involving illegal trades, and that Baker had been recorded

**2.** Bailin also argues that his statements should be suppressed because he sufficiently manifested his desire not to discuss matters any further without the benefit of counsel. *See Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The court concludes that Bailin merely asked the agents whether he needed to obtain counsel, a question to which the agents properly responded by stating that it was a decision he would have to make for himself.

as a participant in some of those conversations. Volk then informed Baker that the United States Attorney's office was considering bringing charges against him.

6. AUSA Gillogly then told Baker that if he wanted the agents and attorneys to leave, all he had to do was "say the word adios and we're out of here." At that point, Gillogly informed Baker that he was facing charges under RICO, the federal wire and mail fraud statutes, and the Commodities Exchange Act. Gillogly explained the scope of these statutes, the potential sentences under them, and possibility of forfeiture under RICO.

7. Baker told the agents that he wanted to cooperate, but that he first wanted to reach some form of agreement with the United States Attorney's Office "to protect his family." Gillogly told Baker that his office was in no position to enter into such an agreement; however, any cooperation would be considered in the charging decision and would be made known to the sentencing judge.

8. On at least two, possibly three occasions, Baker asked the agents whether he needed to hire an attorney. AUSA Gillogly told Baker that he was unable to advise him on that decision, but that Baker was free to retain an attorney if he thought he needed one.

9. At some point during the interview, Baker asked Gillogly whether he was entrapped when he entered into a series of transactions with Agent Volk for tax purposes. Gillogly responded by chuckling and telling Baker he hoped that that would be his defense.

10. At the time of the interview, Baker was tired and "stressed out" from the day's trading, which was particularly heavy because the trade deficient figures had been released that day by the Commerce Department (a day known as "Merchandise Trade Day" in the nomenclature of the Exchanges).

11. On the evening of the interview, Baker had come home from work four hours late. He had been at a bar after work and probably had some drinks; however, there was no testimony as to how much he may have had to drink. Before the agents arrived, Baker drove the couple to a local fast food restaurant to pick up dinner.

12. Although Baker drank two beers during the scope of the two to three hour interview, he was not drunk. Rather, he was "composed," "relaxed," "calculating" and "in complete control."

### B. Conclusions of Law on Baker's Motion

Baker argues that his statements should be suppressed because the Government's conduct constituted "refined coercion" intended to make Baker cooperate. Baker contends that the Government's decision to interview him after a particularly stressful day, its use of sarcasm during the interview, and its references to the sentences and forfeiture provisions of RICO robbed him of his free will and caused him to make his statements involuntarily.

Baker does not dispute that his statements were made in a noncustodial setting. Therefore, the question before the court is whether Baker's free will was overborne by virtue of the interrogative conduct of the agents. *Culombe*, 367 U.S. at 602, 81 S.Ct. at 1879. Upon reviewing the totality of the circumstances, the court concludes that Baker, like the defendant in *United States v. Hocking*, was not "subjected to the type of debilitating coercion necessary to render a confession or statement involuntary." *Id.* 860 F.2d at 775.

In *Hocking*, the Seventh Circuit was faced with a direct appeal from an appellant alleging that the conduct of two FBI agents during a three hour interview in his home constituted "mental coercion" rendering his confession involuntary. *Id.* at 773. In reaching its conclusion that the conduct of the agents was not coercive, the court underscored the circumstances of the interview in that case; circumstances quite similar to those surrounding Baker's interview. The appellant in *Hocking* was a mature adult who had worked in a relatively sophisticated field. He invited the agents into his home after they identified

themselves and asked appellant if he would answer their questions regarding an ongoing investigation. During the subsequent noncustodial interview, the agents sat a few feet away from the appellant in his living room while they politely asked him questions about his conduct. They informed him that he faced possible prosecution, imprisonment and forfeiture. After denying any involvement in the fraudulent acts outlined by the agents, the appellant ultimately confessed to them. *Id.* at 774–75.

The Seventh Circuit reviewed the foregoing circumstances and concluded that the agents' conduct could not be characterized "as anything more than vigorous, persistent questioning, conduct which our court has held does not vitiate an otherwise valid confession." *Id.* at 775. That same conclusion holds for the conduct of the agents during their interview with defendant Baker in this case. Baker invited the agents into his home. He answered their questions freely, and sought protection for his family in exchange for his cooperation. The preponderance of the evidence reveals that he freely chose to make his statements to the agents.[3]

■ Baker's final argument is that this court should exercise its supervisory powers to suppress his statements because AUSA Gillogly rendered legal advice to Baker during the scope of the interview. Baker claims that AUSA Gillogly's conduct violated DR 7–104(a)(2) of the Illinois Code of Professional Responsibility, and that this provides an independent basis for suppressing the statements.

Disciplinary Rule 7–104(a)(2) provides that "[d]uring the course of his or her representation of a client[,] a lawyer shall not ... give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of his [or her] client." Baker's argument starts with the proposition that the Disciplinary Rule is applicable to Government attorneys. *See United States v. Hammad,* 858 F.2d 834 (2d Cir.1988). He goes on to urge the court to enforce the Rule by exercising its supervisory powers to suppress the statements made subsequent to the violation. *Id. But see United States v. Scarpelli,* 713 F.Supp. 1144, 1159–61 (N.D.Ill. 1989).

This motion raises significant issues regarding the reach of the Disciplinary Rules and the scope of the court's supervisory authority. However, the court need not reach these questions because the testimony at the hearing establishes that none of statements made by the AUSAs constituted "legal advice" as that term is contemplated by the Rule.[4] Baker claims that the following statements constituted legal advice: 1) AUSA Gillogly's statement that Baker was facing possible charges, imprisonment, and forfeiture; 2) an unidentified agent's statement that Baker was probably ineligible for the appointment of a public defender, and; 3) AUSA Gillogly's act of chuckling at Baker's entrapment defense question and telling Baker that he hoped that that would be his defense. On their face, none of these statements can be fairly understood

---

3. Baker seeks to distinguish *Hocking,* both factually and by citing to *Bram.* The factual distinctions between the circumstances in *Hocking* and those in the present case are not significant. With reference to Baker's claim that he was drunk during the interview, the court does not credit Sally Baker's testimony on this issue. She testified that she knew her husband was drunk because he came home late from work on a stressful day, after which he drove to a fast food restaurant. The only testimony regarding the amount that Baker had to drink established that he had no more than two beers during the scope of a three hour interview. On the other

hand, the testimony of the agents was that Baker was "composed," "relaxed," "calculating" and "in control" during the entire interview. There is no basis for an inference that Baker was explicitly promised leniency in exchange for his cooperation. AUSA Gillogly informed Baker that his office was in no position to make such an agreement.

4. Another judge of this court has persuasively held that violation of the Code does not establish a basis for a motion to suppress. *United States v. Dempsey,* No. 89 CR 666, slip op. at 4–7 (N.D.Ill. March 1, 1990).

to constitute legal advice to Baker.[5] In point of fact, all of the parties agree that when Baker asked whether he should retain an attorney, AUSA Gillogly explicitly stated that he could not provide advice on that issue. Baker's motion to suppress on the basis of the alleged disciplinary rule violation is denied.

## III. CALI'S MOTION TO SUPPRESS

Cali seeks to suppress his statements made to FBI agents and AUSAs on the grounds that they were given involuntarily. Alternatively, he seeks to have the court invoke its supervisory powers to suppress the statements because the AUSA allegedly offered legal advice during their interview. At the hearing on the motion, the Government presented four witnesses on its behalf. Cali did not present any witnesses or evidence in support of his contentions.

### A. Findings of Fact on Cali's Motion

1. On the morning of January 18, 1989, James Sledz, a trader who turned Government informant, informed Cali that FBI agents wanted to speak with him at Sledz's apartment in the Presidential Towers complex. In doing so, Sledz handed Cali a handwritten note warning the defendant not to say anything because Sledz was wired with a microphone.

2. Cali agreed to meet with Sledz in the McDonald's restaurant in the Presidential Towers apartment complex later that day after the closing of the Exchange.

3. At the time of this meeting, AUSA Gillogly, AUSA Mark Pollack, Agent Volk, Special Agent Charles Near, and Brian Sledz were waiting in Sledz's apartment. After meeting with Cali, James Sledz called up to the apartment to inform the group that Cali was reluctant to come upstairs.

4. Brian Sledz and Agent Volk responded by going to the lobby to persuade Cali to come upstairs. In the lobby, Cali ad-dressed Volk initially by saying "Hi Peter or Dietrich, or whatever your name is."

5. Agent Volk told defendant about the investigation and that it was important for him to come upstairs to hear what the agents had to say. Cali agreed to do so at approximately 2:45 p.m.

6. AUSA Gillogly addressed Cali first by telling him that he was free to leave the apartment anytime he wanted. He also told Cali that he was not obligated to make any statements if he did not want to.

7. Gillogly then informed Cali about the investigation and the recordings of his possibly illegal trades. Gillogly told Cali that he could be charged with RICO, mail and wire fraud, and violations of the Commodities Exchange Act. Gillogly further explained to Cali that he could be facing a twenty-year sentence under RICO and possible forfeiture.

8. At some point in the interview, Cali asked whether he needed a lawyer. Gillogly responded by telling him that the agents were not in a position to advise him on that matter; it was a decision he was going to have to make for himself.

9. Cali proceeded to answer the agents' questions. He agreed to cooperate with them in the investigation.

10. The interview lasted for an hour to an hour and one half, until Cali noted that he had to meet his wife because they were buying a house the next day. Cali assured the agent that he wanted to continue cooperating with them.

### B. Conclusions of Law on Cali's Motion

■ Cali contends that his statements to the agents were made against his will. He begins by arguing that his meeting with the agents constituted a custodial arrest, thus requiring the agent to read him his *Miranda* rights. This contention is unavailing. The testimony establishes that Cali freely chose to talk to the agents. He

---

**5.** Baker also seeks leave of court to call AUSAs Gillogly and Bargmann as witnesses who can supplement the poor recall of Sally Baker regarding the legal advice given to her husband. The justification for this previously denied request is the grounds for its summary denial pursuant to the reasoning of this court in its prior order on the matter. *United States v. Bailin,* No. 89 CR 668, 1990 WL 16435 (Jan. 22, 1990) (denying request to call AUSAs under the "compelling and legitimate need" standard).

agreed to proceed up to the apartment to continue the discussion with the AUSAs and other agents. Although he was told that Cali was free to leave, he voluntarily submitted to questioning by the agents. There is no evidence that Cali was ever prevented from ending the interview at any time. *Hocking,* 860 F.2d at 773.

■ The testimony also establishes that Cali ultimately cooperated with the agents based upon his own free will. There is no evidence of the type of coercive police activity required to find that the agents overbore defendant's will. *Id.* at 774–75. Finally, Cali's motion for suppression based on DR 7–104(a)(2) is unavailing because there is no evidence that the AUSAs gave him any legal advice during the interview. An AUSA's act of informing Cali of the potential charges against him does not constitute "legal advice" within the meaning of the Rule. Accordingly, Cali's motion to suppress is hereby denied.

IT IS THEREFORE ORDERED that the motions of defendants to suppress their statements are denied.