**UNITED STATES of America, Plaintiff,**

v.

**Martin J. DEMPSEY, et al.,
Defendants.**

**Nos. 89 CR 666–1 to 89 CR 666–3, 89 CR 666–8 and 89 CR 666–11.**

United States District Court,
N.D. Illinois, E.D.

June 1, 1990.

See also 740 F.Supp. 1295.

Thomas M. Durkin, Sheila Finnegan, Barry R. Elden, Asst. U.S. Attys., Chicago, Ill., for U.S.

Ann Tighe, Cotsirilos, Crowley, Stephenson, Tighe & Streicker, Chicago, Ill., for Martin Dempsey.

James R. Streicker, Matthew F. Kennelly, Cotsirilos, Crowley, Stephenson, Tighe & Streicker, Chicago, Ill., for James Nowak.

Donald Shine, Michael J. Daley, Nisen & Elliot, Chicago, Ill., for Charles Bergstrom.

James S. Montana, Jr., Susan G. Feibus, Chicago, Ill., for Bruce Mittlestadt.

Robert L. Byman, Thomas K. McQueen, Jenner & Block, Chicago, Ill., for Joel Fetchenhier.

### MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

Defendants are charged with engaging in various illegal trading practices in the

soybean pit of the Chicago Board of Trade. Before the Court are the motions of defendants Dempsey, Nowak, Bergstrom, Mittlestadt, and Fetchenhier to suppress certain statements made to the government. Hearings were held on each of the five motions. For the following reasons, the motions are all denied.

## I. INTRODUCTION

The motions dealt with in this opinion are very similar to motions to suppress previously ruled upon by Judge Hart in *United States v. Bailin*, 736 F.Supp. 1479 (N.D.Ill. April 19, 1990), a similar case involving the Japanese yen pit of the Chicago Mercantile Exchange. Judge Hart noted that while it may seem that it would never be in the best interest of a criminal suspect to respond to questions, suspects do make admissions because, for whatever reason, they believe that cooperating with the authorities is the best course of action to follow. *Id.* at 1. The fact that statements do not appear to be in the best interests of a suspect does not necessarily indicate that the statements were not intentionally made. *See Id.* Suppression of an admission is only appropriate if circumstances prevent the suspect from making a rational choice between making a statement or remaining silent. *Id.* at 1–2; *Weidner v. Thieret*, 866 F.2d 958, 963 (7th Cir.1989); *United States v. Rutledge*, 900 F.2d 1127, 1129 (7th Cir.1990).

The statements at issue in this case stem from a series of interviews conducted by Assistant United States Attorneys and FBI agents between January 17 and January 19, 1989 at the homes of defendants Dempsey, Nowak, Bergstrom, Mittlestadt, and Fetchenhier. While each of these defendants has presented an individual motion, and each motion must be considered separately to determine if each individual's statement was voluntary, we will not ignore the similarity between the interviews or the fact that all occurred as part of a definite government plan. The government's overall strategy in conducting these interviews is relevant as part of the "totality of the circumstances" surrounding each individual interview, and also bears on the credibility of the parties' assertions as to what happened in the individual homes.

■ The main issue raised in defendants' motions to suppress is whether defendants' statements were voluntary. Defendants argue that their statements were not voluntary but were obtained only through government threats, promises, and psychological pressure. The issue of defendants' sixth amendment right to counsel has not been raised in connection with these interviews because the interviews were all conducted before the institution of adverse legal proceedings, so that defendants' sixth amendment rights had not yet arisen. Defendants did argue in their motions to suppress that the statements were taken from them in violation of their *Miranda* rights, but did not press this argument at the hearings, and in fact the evidence from the hearings demonstrates that none of the defendants were in custody at the time of the interviews. The issue of whether defendants' *Miranda* rights were violated is thus not prominent, leaving the voluntariness of defendants' statements as the main issue for this court to consider. The individual hearings on defendants's motions were held between May 7 and May 14, 1990. We find that each motion to suppress should be denied.

## II. DEMPSEY'S MOTION TO SUPPRESS

Defendant Dempsey seeks to suppress statements made to government agents at an interview at his home on January 17, 1989. FBI agents Richard Ostrom and Jeffrey Frank testified at the hearing on Dempsey's motion to suppress.

### A. Findings of Fact

1. At approximately 10:45 p.m. on January 17, 1989, Assistant United States Attorney ("AUSA") Ira Raphaelson and FBI agents Richard Ostrom and Jeffrey Frank (collectively referred to as "the government" or "government agents") went to Dempsey's home and knocked on his door. No one answered the door, though the government agents noticed a light on in the

house, and the agents drove a short distance from the house.

2. AUSA Raphaelson then phoned Dempsey, identified himself, told him the government agents were in the neighborhood, and asked him if the agents could come to his home. Dempsey agreed.

3. The government agents proceeded to Dempsey's home and again knocked on the door. Dempsey answered the door and invited the government agents in after they identified themselves. The parties then sat down at Dempsey's dining room table.

4. The government did not advise Dempsey of his *Miranda* rights. The entire interview lasted about one hour and forty-five minutes, during which time Dempsey made allegedly incriminating statements.

5. AUSA Raphaelson began the interview by telling Dempsey that Agent Ostrom, who was known to Dempsey as trader Richard Carlson, was really an FBI agent who had taped conversations with Dempsey. Raphaelson went over the possible charges facing Dempsey, but no one mentioned the possibility of forfeiture of Dempsey's assets. Agent Ostrom showed Dempsey some of the tapes the government had, but did not play them.

6. When Dempsey asked what would happen to him, the government informed him that people who cooperate generally "do better." No other statement was made about cooperation.

7. About half way through the interview, Dempsey asked if he needed an attorney. Raphaelson told him that he worked for the government and that Dempsey would have to decide the question for himself.

8. At some point in the interview, Dempsey told agent Ostrom, "Rick, I knew you were an FBI agent." Dempsey indicated that he had learned this from another trader at a cocktail party in November.

9. The conversation between Dempsey and the government agents was businesslike, though Dempsey appeared nervous. No threats were made, nor did Dempsey

ever refuse to talk to the agents or ask them to leave.

10. The interview ended cordially, with Raphaelson asking if he could call Dempsey for another interview. About a half hour after the agents left, Raphaelson again called Dempsey, telling him that there would be press coverage of the investigation but that Raphaelson would not leak the interview to the press.

## B. Conclusions of Law

In his motion to suppress, Dempsey argued that the government violated his *Miranda* rights. This argument was not pressed at the hearing, however, and it is apparent that the government was not required to give him the *Miranda* warnings. The warnings are only required if a defendant is in custody. *United States ex rel. Link v. Lane*, 811 F.2d 1166, 1170 (7th Cir.1987) (quoting *Miranda v. Arizona*, 384 U.S. 436, 439, 86 S.Ct. 1602, 1609, 16 L.Ed.2d 694 (1966)). Dempsey was never in custody during this interview; none of the facts suggest that Dempsey could have believed that he was not free to leave or that he could not have asked the government agents to leave. *See United States v. Hocking*, 860 F.2d 769, 773 (7th Cir. 1988), which is discussed below.

Dempsey argues that his statement was involuntary and the result of psychological pressure exerted upon him by the government rather than the product of his own free will. In determining whether a statement is voluntary a court must look to the "totality of the circumstances" surrounding the statements, taking into account factors such as the characteristics of the accused and the length of the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). A statement is involuntary if it is not the product of the defendant's free choice but rather was made because the defendant's will was "overborne." *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). An approach for determining voluntariness which has been endorsed by the Seventh Circuit is to ask "whether the

government has made it impossible for the defendant to make a *rational* choice as to whether to confess...." *United States v. Rutledge*, 900 F.2d at 1129 (7th Cir.1990). All of the defendants have also claimed that the government deceived them in the course of these interviews. A statement will not be suppressed on the basis of government deception unless the evidence demonstrates that the government affirmatively misled the defendant and that the misinformation furnished by the government was material to his decision to render a statement. *United States v. Serlin*, 707 F.2d 953, 956 (7th Cir.1983).

One case which is particularly relevant to all of the motions to suppress in this case is *Hocking*, 860 F.2d at 769. Hocking was visited at his home at 5:30 p.m. one evening by two FBI agents. *Id.* at 770. He invited the agents into his home after they knocked on his door, identified themselves, and told him that they wanted to ask him some questions relating to an ongoing criminal investigation. *Id.* After asking Hocking's wife to leave the room, and without advising him of his *Miranda* rights, the agents began questioning Hocking. *Id.*

Hocking was a financial analyst with the Illinois Department of Transportation ("IDOT"), and his job involved assessing the financial strength and work capabilities of contractors bidding on IDOT road construction contracts. *Id.* The agents began Hocking's interview by asking him to explain his job, and then confronted him with allegations that he had accepted money from contractors in exchange for granting them favorable treatment in the evaluation process. *Id.* Hocking denied having accepted any money, but the agents told him that they had tapes of conversations between him and contractors concerning payoffs. *Id.* The agents also told Hocking that he faced criminal charges, that he could be imprisoned, and that some of his assets could be forfeited. *Id.* They also encouraged him to tell the truth. *Id.*

Hocking continued to deny any wrongdoing for a time, but finally signed a statement in which he admitted to accepting $1000 from a contractor in exchange for

favorable treatment. *Id.* at 771. The Seventh Circuit considered several factors in determining that Hocking was not in custody—the fact that he gave the agents permission to enter his home, his voluntary submission to questioning, the polite tone of the interview, and the fact that he never asked the agents to leave his home. *Id.* at 773. The court also found that Hocking's statement was voluntary, and that his will was not overborne by the government agents, *id.* at 775, after considering the "totality of the circumstances" surrounding his interrogation. *Id.* at 774–75. The court noted that Hocking was a mature adult, that the tone of the conversation was polite, and that he never asked the agents to leave his home. *Id.* The fact that the agents informed Hocking that he faced prosecution and possible imprisonment and forfeiture did not render his statement involuntary. *Id.*

Dempsey argues that the statements he made to the government on January 17, 1989 were involuntary because they were made only as a result of the government's threatening him and exerting psychological pressure on him by, among other things, telling him that it was in his best interests to cooperate. We find that Dempsey's statements were voluntary and should not be suppressed. The circumstances surrounding Dempsey's statements are very similar to those in *Hocking*. As in that case, the tone of the conversation between Dempsey and the agents was polite, and he never asked the agents to leave his home or refused to speak with them.

The only real distinctions between this case and *Hocking* are that in this case Dempsey was visited by an Assistant United States Attorney as well as FBI agents, and that the visit here came later in the evening. The additional presence of an Assistant U.S. Attorney did not render the interview significantly more coercive, even when combined with the fact that it occurred at 10:45 p.m. The lateness of the hour might tend to suggest that the government intended to, and did, surprise Dempsey. At the hearing, Dempsey sought to establish that the type of interview conducted at his home was known to the government agents as a "heart attack"

interview. The government, however, denies the existence of such a term, and we find that whether this term was used is immaterial; the questions are whether Dempsey was surprised by the interview and whether his surprise had an effect on the voluntariness of his statement. The evidence suggests that Dempsey was not entirely surprised to see the government agents. During the interview he told them that he had known that Ostrom was an FBI agent since November of the previous year. The court is convinced that, while Dempsey may not have been expecting the government that night, he was not entirely taken by surprise by their visit. His surprise at the mere timing of the government's appearance could not have rendered his statement involuntary, when one considers the fact that Dempsey was a sophisticated adult.

The "totality of the circumstances" surrounding Dempsey's statements establish that they were made voluntarily. While the government certainly wanted him to cooperate, the agents did not need to press him very hard before he made a statement. The government did tell him of the charges he was facing, including possible RICO violations, but the agents did not talk about specific penalties such as imprisonment or forfeiture. *Cf. Hocking,* 860 F.2d at 770. The government also did not advise Dempsey not to get an attorney. He was not told of any specific benefits he would receive as a result of his cooperation. Finally, there was no evidence of government deception in this case. While Dempsey makes much of the government's listing of the charges against him, there was absolutely no evidence that the listed charges were inaccurate, or that the government lied about anything during the interview. After considering all the evidence presented at the hearing, we find that Dempsey made a rational decision to speak to the government agents. *See Rutledge,* 900 F.2d at 1129. His motion to suppress is thus denied.

### III. NOWAK'S MOTION TO SUPPRESS

Defendant Nowak seeks to suppress statements made to agents of the government at an interview at his home on January 18, 1989. FBI agents Richard Ostrom and Jeffrey Frank testified at the hearing on Nowak's motion to suppress.

#### A. Findings of Fact

1. On January 18, 1989, at approximately 7:00 a.m., Assistant United States Attorney Ira Raphaelson and FBI agents Richard Ostrom and Jeffrey Frank went to Nowak's home in Elk Grove Village.

2. The agents knocked on the door, Nowak answered, and the agents identified themselves. The agents told Nowak that they wanted to talk to him about illegal trading activity, and he invited them in.

3. The government agents interviewed Nowak in his home for about an hour and a half, during which time he made allegedly incriminating statements. During the interview, Nowak appeared nervous and his mouth was dry.

4. The government did not advise Nowak of his *Miranda* rights. AUSA Raphaelson began the interview by telling Nowak about the undercover operations at the Chicago Board of Trade, and that the government had found that Nowak had committed felony violations under the mail and wire fraud statutes, the Commodity Exchange Act, and RICO. The agents showed Nowak tapes which they said documented illegal trades on his part, but did not play the tapes.

5. Raphaelson told Nowak that the government knew that he had engaged in illegal trades. Most of the parties' conversation, however, concerned Nowak's background and general trading practices.

6. The government did not mention anything specifically about the consequences of Nowak's cooperation; they told him that people who cooperate generally fare better. When Nowak asked the agents if he could continue to trade, Raphaelson told him that they could not advise him on this point but that continued trading might expose him to civil liability.

7. The question of illegal trading on the New York Stock Exchange came up, and Raphaelson told Nowak that the Chicago authorities were not like the New York authorities. Specifically, Raphaelson told Nowak that "we do not arrest people on the floor [of the exchange]—we talk to them at home."

8. At some point in the interview Nowak told the agents that he had learned from Dempsey that Ostrom was an FBI agent.

9. During the interview the government agents did not threaten Nowak or make any specific promises to him. Nor did they mention the specific penalties accompanying a RICO conviction. Nowak did not refuse to talk to the agents, nor did he ask them to leave.

10. At the end of the interview the government agents told Nowak that they would call him the next day for a further interview. Ostrom in fact called Nowak two days later, on January 20, at which point Nowak asked Ostrom why he hadn't called the previous day.

11. During this January 20 phone conversation with Ostrom, Nowak asked Ostrom if he should get an attorney, and Ostrom told Nowak that he could not advise him on this point. When Nowak asked Ostrom what Ostrom would do, however, Ostrom told Nowak that he would get an attorney if he were in Nowak's situation.

12. After this January 20 phone conversation, Ostrom and Nowak talked about an attorney on more than one occasion and Nowak told Ostrom that he was having trouble finding one.

B. Conclusions of Law

The evidence produced at the hearing demonstrates that Nowak was not in custody at the time of his interview, so that his *Miranda* rights were not violated. *See United States v. Hocking*, 860 F.2d 769, 772–73 (7th Cir.1988). Nowak's primary argument is that his statements were not voluntary but were the product of government coercion. The totality of the circumstances, however, indicate that Nowak's statements were voluntary.

The tone of the interview between Nowak and the agents was polite, and he did not refuse to speak with them or ask them to leave. *See Hocking*, 860 F.2d at 774–75. While the government came to Nowak's home early in the morning, his statement that he had learned from Dempsey that Ostrom was an FBI agent suggests that he was not entirely surprised to see the agents. The evidence produced at the hearing showed that the government agents did not threaten Nowak. While they told him of the charges he was facing, they did not discuss specific penalties with him. *Cf. Hocking*, 860 F.2d at 770. They also did not make any false promises of leniency or engage in any other intentional deception. In addition, when agent Ostrom called Nowak on January 20, Nowak asked Ostrom why he hadn't called the day before, as promised. This statement is certainly not dispositive on the issue of Nowak's state of mind on January 18, but it does demonstrate his general willingness to talk to the government. The evidence demonstrates that the government agents did not make it impossible for Nowak to make a rational choice as to whether to make statements to them. *Rutledge*, 900 F.2d at 1129. His motion to suppress is denied.

IV. BERGSTROM'S MOTION TO SUPPRESS

Defendant Bergstrom seeks to suppress statements made to government agents at an interview at his home on January 18, 1989. FBI agents William Hanes and Gregory Schwalbach testified at the hearing on Bergstrom's motion.

A. Findings of Fact

1. Shortly before 3:30 p.m. on January 18, 1989, Assistant United States Attorney Thomas Durkin and FBI agents William Hanes and Gregory Schwalbach were in a car near Bergstrom's home in Flossmoor. One of the agents called Bergstrom to see if he was home, and when Bergstrom answered asked if he wanted to renew a magazine subscription.

2. The government agents then proceeded to Bergstrom's home, arriving at approximately 3:30 p.m. As the agents came to the front of Bergstrom's home, they saw him leaving out the back door.

3. The agents went around to the back of the house, where they introduced themselves and asked if they could talk to Bergstrom. Bergstrom agreed, and the government agents went in the house with him and sat down at the dining room table. On the way in the house AUSA Durkin complimented Bergstrom on his nice home.

4. The government agents were at Bergstrom's home for about fifteen to twenty minutes. He did not seem surprised to see them, nor did he appear nervous.

5. After the agents sat down in Bergstrom's dining room he asked them who was representing him, and the agents told him that none of them were representing him, because they all worked for the government. Bergstrom was not given a *Miranda* warning.

6. Bergstrom gave the agents his name, social security number, and birthdate. The agents then asked if he knew of any illegal trading activity, and he said that he did not. At no point did he make any incriminating statements.

7. After asking about the illegal trading the agents asked another question, but Bergstrom told them that he did not want to talk to them without his attorney present. At this point Hanes and Durkin left the room and went to an adjoining room, where they decided to terminate the interview.

8. Durkin and Hanes then returned to the dining room, and told Bergstrom that there had been an ongoing investigation for some time, and that Bergstrom's situation was very serious. They also told him that Ostrom had been a "mole" on the floor of the Board of Trade and that Ostrom had conversations with Bergstrom on tape. The agents did not show Bergstrom any tapes.

9. Durkin told Bergstrom that he faced charges of mail fraud, wire fraud, and violations of the Commodity Exchange Act and of RICO. Durkin explained that under RICO, Bergstrom's assets, including his house, his trading seat, and his auto, could be seized. Durkin's tone during this explanation was calm and businesslike. He did not mention any specific jail term. Bergstrom was told that people who cooperate generally get better treatment. Bergstrom never asked the agents to leave his home.

10. After Durkin told him of the charges against him, Bergstrom asked the agents if they planned to arrest him, and said that if they did he would have to make arrangements. The agents told him that they were not going to arrest him.

11. At the end of the interview the agents gave Bergstrom a subpoena and told him that he should not destroy anything. Durkin told Bergstrom not to discuss the interview with anyone, and the agents then left.

B. Conclusions of Law

It is evident that Bergstrom was not in custody at the time of the interview, so his *Miranda* rights could not have been violated. *See United States v. Hocking*, 860 F.2d 769, 772–73 (7th Cir.1988). Bergstrom's main contention is that his will was overborne so that his statement was not voluntary. He argues that AUSA Durkin improperly coerced him into making a statement by threatening him with seizure of his property, including his home. The evidence at the hearing, however, established that Bergstrom's denial of knowledge of illegal trading activity, which is the only statement at issue, was made before the discussion of forfeiture. This statement could not have been coerced by Durkin's discussion of forfeiture.

The remainder of the circumstances surrounding Bergstrom's statement demonstrate that it was made voluntarily. The tone of the conversation was polite and businesslike, and Bergstrom did not ask the agents to leave. *See Hocking*, 860 F.2d at 774. He did refuse to speak with the agents, but only after making the statement sought to be suppressed. The agents wanted their visit to be unexpected, but

agent Hanes testified that Bergstrom did not seem surprised to see them. It is likely that Bergstrom did not expect to see the agents that particular day, but was not completely surprised to see them.

Before Bergstrom made the statement sought to be suppressed, the government agents did not mention the prospect of forfeiture of Bergstrom's assets. At no time did anyone mention a specific prison term. In addition, the government did not engage in any deceptive acts which could have coerced Bergstrom into making the statement. The evidence produced at the hearing demonstrates that the government agents did not make it impossible for Bergstrom to make a rational choice as to whether to make a statement. *Rutledge,* 900 F.2d at 1129. Bergstrom's motion to suppress is denied.

While we have denied Bergstrom's motion to suppress, his motion has raised another issue which we feel compelled to address. When a defendant seeks to suppress a statement, it is almost always because the statement is incriminating. Bergstrom's motion is unusual because his statement was exculpatory, and in fact would be pointless if the government had not seen fit to bring false statement charges against him under 18 U.S.C. § 1001.

The evidence produced at the hearing has made clear that by the time the government interviewed these defendants it had a definite idea as to what specific charges were going to be brought against each defendant. Indeed, the government admitted at the hearings that it visited these defendants with the purpose of obtaining incriminating statements, and it clearly asked questions which were designed to elicit admissions. The government received admissions from some of the defendants. When it received denials from certain defendants rather than admissions, the government later brought false statement charges against these defendants under 18 U.S.C. § 1001. Clearly these defendants

suffered an increased threat of criminal liability whether they admitted or denied wrongdoing. The only way these defendants could have avoided this Catch–22 situation would have been by refusing to respond to the questions altogether, but none were advised of their *Miranda* rights.

The government's decision to bring false statement charges against Bergstrom, Fetchenhier, Mittlestadt, and Ashman after these defendants denied wrongdoing obviously could not have affected the voluntariness of their statements.[1] Nonetheless, the government's conduct raises serious questions as to whether the government can prove the materiality of the defendants' false statements, as is required under 18 U.S.C. § 1001. Whether a statement is material is a question of law for the court, *United States v. Brantley,* 786 F.2d 1322, 1327 (7th Cir.1986), and "[t]he test for materiality is whether the false statement has a tendency to influence or is capable of influencing a federal agency." *Id.* at 1326. Given the status of the government's investigation at the time of these interviews, we have doubts as to whether this materiality test is satisfied here. We are reluctant to dismiss the false statement charges *sua sponte,* however, as the government has not had an opportunity to prove the materiality of the charges. The court would consider this matter if defendants chose to raise it in a motion to dismiss or in a motion for directed findings at the close of the government's case at trial. If defendants choose to file motions to dismiss the false statement charges they may do so within twenty-one days of this order, and of course any such motions would be excepted from the May 18, 1990 motion cut-off date, which is still in effect for all other motions.

## V. MITTLESTADT'S MOTION TO SUPPRESS

Defendant Mittlestadt seeks to suppress statements made to government agents on January 19, 1989. FBI agents Richard Os-

---

**1.** Ashman filed a motion to suppress statements made to the government agents, but later withdrew it.

trom and Jeffrey Frank testified at the hearing on Mittlestadt's motion to suppress.

## A. Findings of Fact

1. Assistant United States Attorney Ira Raphaelson and FBI agents Richard Ostrom and Jeffrey Frank went to Mittlestadt's home on January 19, 1989. Mittlestadt answered the door, and Raphaelson introduced the agents and told Mittlestadt that they wanted to talk to him about illegal trading practices. Mittlestadt invited the agents in.

2. The agents did not advise Mittlestadt of his *Miranda* rights. The agents asked him a few questions, and told him that they had tapes implicating him in illegal trading activity. They told him that he was facing charges of mail fraud, wire fraud, and RICO, but did not mention any specific penalties. Mittlestadt denied any wrongdoing.

3. The agents then asked Mittlestadt about a specific prearranged trade, and he denied making the trade. Mittlestadt told the agents that trading "locals" sometimes assumed trading errors but that this was never done from his customer "deck."

4. Agent Ostrom told Mittlestadt that he could not deny making the trade because Ostrom had the trade on tape. Ostrom also told Mittlestadt that he was not dealing with the Commodities Futures Trading Commission or a Chicago Board of Trade ("CBOT") internal proceeding, but was faced with a serious matter that would not go away. Mittlestadt then responded that he could not say that he had never made an illegal trade.

5. The government agents handed Mittlestadt some subpoenas, and he said that he wanted to talk to the CBOT attorney. Ostrom told him that the CBOT attorney would take care of the Board, and that Mittlestadt should get his own defense attorney because of this conflict. Mittlestadt said that he would have to talk to his attorney before cooperating.

6. The agents discussed cooperation with Mittlestadt in general terms, telling him that people who cooperated generally did better. The agents did not threaten him or make any specific promises.

7. Mittlestadt appeared pale, uncomfortable, and very nervous throughout the interview, and at one point told the agents, "I'm scared shitless." The agents were concerned about Mittlestadt, and discussed his well-being among themselves after leaving his home. They said that they hoped he would get himself an attorney and not "do anything stupid," such as committing suicide.

## B. Conclusions of Law

The evidence produced at the hearing demonstrates that Mittlestadt was not in custody at the time of the interview, so that his *Miranda* rights were not violated. *See Hocking*, 860 F.2d at 772–73. Mittlestadt's primary contention is that his statements were the product of psychological coercion which caused his will to be overborne. The totality of the circumstances, however, indicate that his statements were voluntary.

Mittlestadt invited the government agents into his home, and did not ask them to leave. *See Hocking*, 860 F.2d at 774–75. He mentioned that he wanted to talk to his attorney before cooperating, but only after making the statements sought to be suppressed. *See Id.* The agents did not threaten Mittlestadt, they did not discuss RICO forfeiture, and they did not make any specific promises. The government also did not deceive Mittlestadt in any way. Mittlestadt did seem very nervous during the interview, but this is the unfortunate result of any government interview of a suspect. The interview here was not conducted in a very coercive matter. In addition, Mittlestadt's nervousness, by itself, does not indicate that his statement was involuntary, especially when the other circumstances suggest that it was voluntary. The evidence presented at the hearing, taken as a whole, demonstrates that the government agents did not make it impossible for Mittlestadt to make a rational choice as to whether to make statements.

*Rutledge,* 900 F.2d at 1129. His motion to suppress is denied.

## VI. FETCHENHIER'S MOTION TO SUPPRESS

Defendant Fetchenhier seeks to suppress a statement made to government agents on January 18, 1989. FBI agents Richard Ostrom and Jeffrey Frank testified at the hearing on Fetchenhier's motion to suppress.

### A. Findings of Fact

1. Sometime in the early evening of January 18, 1989, Assistant United States Attorney Ira Raphaelson and FBI agents Richard Ostrom and Jeffrey Frank went to Fetchenhier's home. Fetchenhier was not home, so the agents returned at approximately 6:30 p.m.

2. At 6:30 p.m. Fetchenhier answered the door, and the agents identified themselves. Fetchenhier indicated that he already knew Ostrom. The agents told Fetchenhier that they had been interviewing people for the last thirty-six hours, and Raphaelson commented "you don't seem surprised to see us." Fetchenhier shrugged and allowed the agents to enter his home.

3. The agents did not advise Fetchenhier of his *Miranda* rights. Raphaelson began the interview by telling Fetchenhier about the extent of the investigation, showed him some tapes, and told him that he was facing criminal charges, including violations of RICO. None of the agents mentioned forfeiture or the word "racketeering."

4. Very early in the interview, Fetchenhier told the agents that he "never took a dime illegitimately." The agents then asked him questions about specific trades, and asked him if he ever traded after the close of trading. Fetchenhier made general denials.

5. Ostrom told Fetchenhier that the investigation was a serious matter, that it was an FBI investigation rather than a Board of Trade investigation, and that it was not going to go away. The agents

asked for Fetchenhier's cooperation, telling him that people who cooperated generally did better.

6. Ostrom mentioned a specific trade between himself and Fetchenhier. Fetchenhier replied that he had made "some trades of convenience."

7. Fetchenhier asked if he needed an attorney. At this point the agents stopped questioning Fetchenhier and asked him to keep the interview confidential. The agents then served Fetchenhier with a subpoena.

8. During the interview the agents did not make any threats or specific promises. Fetchenhier appeared perturbed rather than frightened during the interview.

### B. Conclusions of Law

It is evident that Fetchenhier was not in custody at the time of the interview, so his *Miranda* rights could not have been violated. *See Hocking,* 860 F.2d at 772–73. Fetchenhier's main argument is that his statements were involuntary and the product of government coercion. The totality of the circumstances, however, indicate that Fetchenhier's statements were voluntary.

Fetchenhier did not ask the government agents to leave his home, nor did he refuse to answer questions until after making the statements sought to be suppressed. *See Hocking,* 860 F.2d at 773. Fetchenhier seemed to acknowledge that he was not surprised by the government's visit. Indeed, agent Ostrom testified that he seemed perturbed rather than frightened.

The evidence produced at the hearing established that the government agents did not threaten Fetchenhier, make any specific promises, or deceive him in any way. The agents did not mention the possibility of forfeiture under RICO. The agents did not make it impossible for Fetchenhier to make a rational choice as to whether to make statements. *Rutledge,* 900 F.2d at 1129. Fetchenhier's motion to suppress is denied.

 

## VII. CONCLUSION

As promised in the introduction, we gave separate consideration to each defendant's motion to suppress. We also noted there that the government's overall strategy in conducting the interviews was relevant to the individual motions to dismiss. This overall strategy became obvious after hearing the evidence presented at the five hearings.

The government had a well-thought out plan which it followed in conducting interviews of defendants. In conducting these interviews, the government clearly wanted to take defendants by surprise, because it wanted their cooperation. Indeed, the government admitted in the course of the hearings that it definitely wanted defendants to make incriminating statements. None of the defendants were advised of their *Miranda* rights, nor were they told that they did not have to speak to the Assistant U.S. Attorney or FBI agents. The government told defendants they were facing serious criminal charges, which was true. Part of the government's strategy was to scare these defendants, and to a certain extent it succeeded.

Another aspect of the government's strategy became clear at the hearing on Bergstrom's motion to suppress. Bergstrom made a statement denying any participation in illegal trades, and also indicated that he wished to consult with his attorney. At this point, after a short conference between the Assistant United States Attorney ("AUSA") and one of the FBI agents, the AUSA escalated the pressure on Bergstrom by explicitly setting out the potential penalties under RICO, including forfeiture. For all of the other defendants the government denies making any specific references to the penalties available under RICO.

As discussed above, we found that the Assistant United States Attorney's discussion of RICO penalties came after Bergstrom's exculpatory statement, and thus is not relevant to the question of whether his statement should be suppressed. The AUSA's statement does, however, shed a great deal of light on the government's strategy in conducting the interviews. The court is satisfied that, if we are correctly assuming that similar statements were not made to other defendants, it was only because there was no need to. The government was able to obtain statements from the other defendants and serve them with subpoenas without the defendants terminating the interviews.

We make the above observations so that neither side will be under the mistaken impression that this court is not fully aware of the purpose and extent of the government's strategy in conducting the interviews. The government was playing hardball. We make no comment on the propriety of the government's conduct in this case. Rather, we are called upon to decide whether the government's conduct caused these five defendants to make statements against their free will. In each case the evidence has demonstrated that defendants were not coerced into talking, but rather each made a rational decision to render a statement. Defendants' motions to suppress must thus be denied.